In the Matter of The Niagara Falls Power Company, Respondent, against The Water Power and Control Commission, Appellant.

In the Matter of The City of Niagara Falls, Respondent, against The Water Power and Control Commission, Appellant.

(Argued February 27, 1935; decided April 23, 1935.)

*John J. Bennett, Jr., Attorney-General (Charles E. McManus* and *Henry Epstein* of counsel), for appellant.

*Randall J. LeBoeuf, Jr., Chauncey P. Williams, Jr.,* and *Francis T. Carmody* for The Niagara Falls Power Company, respondent.

*George E. Carrie, Corporation Counsel,* for The City of Niagara Falls, respondent.

FINCH, J.   A certiorari order to review a determination of the Water Power and Control Commission, fixing an annual rental to be paid by the petitioner Niagara Falls Power Company of $5 per horse power on 500 cubic feet per second of water diverted from the Niagara river for power purposes, was granted upon the application of the power company. Upon the application of the city of Niagara Falls, a like certiorari order was granted. A single return was made answering both orders. The Appellate Division, two justices dissenting, rendered its decision annulling the determination and remitting the matter to the Water Power and Control Commission. Thereafter the Appellate Division allowed an appeal to

this court and certified one question as follows: "Was the charge of $5 per horse-power as imposed by the Commission in excess of the power of the Commission under the statute prescribing an equitable rental, under the evidence presented in this proceeding? "

The nature of the Niagara river has been sufficiently stated in *Matter of Commissioners of State Reservation at Niagara* (37 Hun, 537; appeal dismissed, 102 N. Y. 734). " The line between the United States and Canada is located in the center of Niagara river. (Treaty of 1783, 8 U. S. Stat. at Large, 55; and that of Ghent in 1814, Id. 221, and such is the boundary of Niagara county, Laws of 1808, chap. 60.) So far as our attention has been called to any authority relating to this river it has been recognized and treated as, in every sense, a public river, as much as if it was an arm of the sea in which tide flowed, and acknowledged as such. (*Tibbits' Case*, 17 Wend. 623; *Kingman* v. *Sparrow*, 12 Barb. 201.) And we think because it is navigable in fact, and constitutes the natural boundary between this and another country, is the reason why the proprietary right from its margin to such boundary line is in the State, and that the riparian owners have taken by the grant referred to only to the water's edge of the stream. And that the fact that at the particular place in question the river is not navigable by reason of the interruption produced by the falls, does not qualify or distinguish it in that locality as a public river from its general character " (p. 547).

Whether the Niagara river is navigable at the particular point of the defendant's intake for water used to create power is immaterial. The Niagara river being navigable in part is thus navigable in whole, so far as the control of the river for purposes of commerce and navigation is concerned. It must be conceded that Congress has the right to control and regulate the use of water in the Niagara river and may make such rules and regulations as it may deem necessary in the case. In *New Jersey* v.

*Sargent* (269 U. S. 328, p. 337) we find this power thus stated: " Rightly to appraise the bill one should have in mind the doctrine, heretofore firmly settled, that the power to regulate interstate and foreign commerce, which the Constitution vests in Congress, includes the power to control, for the purposes of such commerce, all navigable waters which are accessible to it and within the United States, whether within or without the limits of a State, and to that end to adopt all appropriate measures to free such waters from obstructions to navigation and to preserve and even enlarge their navigable capacity; and that the authority and rights of a State in respect of such waters within its limits, and in respect of the lands under them, are subordinate to this power of Congress."

And in *Matter of Long Sault Development Co.* (212 N. Y. 1, p. 10) it was said regarding the St. Lawrence river: " The privilege of the State to control the St. Lawrence as a navigable river (subject to the direction of Congress) cannot be assigned to others in the manner attempted by this legislation. As long as the waters are maintained as navigable they remain public waters of the State; and as long as they remain public waters of the State the State is bound to retain control over them in the public interest."

And quoting from *Illinois Central R. R. Co. v. Illinois* (146 U. S. 387) the opinion continued: " The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace."

The petitioner is a power company, the successor to three others through whom it claims to have grants from the State permitting it to divert the waters of the Niagara river for the purpose of creating commercial power. These grants are under the Laws of 1892, 1893 and 1896. Chapter 513 of the Laws of 1892, relating to the Niagara Falls Power Company, gave the company the right to take and use the waters of the Niagara river to the extent required for the proper operation of the authorized works of said corporation during the continuance of such works, provided that nothing contained in the act should be construed to confer any right to obstruct the navigation of the Niagara river, or to take therefrom more water than sufficient to produce two hundred thousand effective horse power.

Chapter 477 of the Laws of 1893 authorized the Niagara Falls Power Company to furnish the waters of the Niagara river to and through any civil division of the State, to sell and furnish the same to any public body or private person; and chapter 968 of the Laws of 1896, relating to the Niagara Falls Hydraulic Power and Manufacturing Company, to the rights of which petitioner has succeeded, authorized that company to use the waters of the Niagara river to develop power and to sell it to others, limiting the use to such quantity of water as may be drawn by means of a hydraulic canal of said company when enlarged throughout its entire length to a width of 100 feet and to a depth and slope sufficient to carry at all times a maximum uniform depth of fourteen feet of water, provided the exercise of the rights should not impair the practical navigation of Niagara river.

In 1910 the United States entered into a treaty with Great Britain (36 Stat. pt. II, 2448), under article V of which the United States was allowed to divert 20,000 c. f. s. (cubic feet second) at Niagara Falls, and Canada was allowed to divert on its side 36,000 c. f. s.

The claim of the petitioner here is that by reason of these privileges or rights given under the laws above referred to, the power company can draw off a total amount of 20,000 c. f. s. limited by the treaty. The State of New York, on the other hand, through the Water Power Control Commission, claims that Congress and the State in the exercise of their respective powers, and in the interest of preserving the public rights in the Niagara river, and the public use of the waters therein, for navigation and commerce, have very much restricted the petitioner's right to take water, and that under no circumstances can it take more than 15,100 c. f. s. without paying the rate established by these subsequent laws and regulations.

In 1906 the Federal government passed its first act, exercising control and jurisdiction over the waters of this river. It was the Burton Act (34 U. S. Stat. 626, ch. 3621). The act bore the following title: " An act for the control and regulation of the waters of Niagara River, for the preservation of Niagara Falls, and for other purposes." This act prohibited all diversion of waters from the Niagara river or its tributaries except with the consent of the Secretary of War. The maximum total for all users was 15,600 c. f. s. The then Secretary of War, the late Chief Justice TAFT, after investigation, allowed the power company to take 8,600 c. f. s. and the Hydraulic Company 6,500 c. f. s. Later he allowed the Lockport Hydraulic Company to divert 500 c. f. s., making a total of 15,600 c. f. s. permitted to this petitioner or its predecessors to be drawn from the Niagara river. The Burton Act expired, so we are informed, on March 4, 1913 (37 U. S. Stat. 631).

During the late war the use of the Niagara river for power purposes was again under the direct control of the Secretary of War. Permits were issued to the Niagara Falls Company for the use of water from the river. Then came the Laws of 1918 (chs. 596 and 597) by which the

State of New York, with the consent of the petitioner, further regulated the use of the waters of the Niagara. Chapter 596 permitted the Cliff Electrical Distributing Company, the Niagara Falls Power Company and Hydraulic Power Company of Niagara Falls, each being domestic corporations, to consolidate into a single new corporation, with preferred or common stock or both, subject to the approval of the Public Service Commission.

Chapter 597 permitted the new corporation to divert the water of the Niagara river for the development of power, with this proviso: " Provided further that if the corporation constituted by such consolidation shall divert from the Niagara river for power purposes more than fifteen thousand one hundred cubic feet per second, there shall be reserved to the state the right to charge an equitable rental therefor in such amount and in such manner as shall hereafter be provided by law; and provided further than nothing in this act shall be construed as giving the right to discharge water into the Niagara river at a point more than one thousand feet below the lowest point of discharge into such river by any of the corporations so consolidated as now fixed. Nothing in this act shall be construed to waive or alienate any right now vested in the state as to waters now being diverted by any of such corporations so consolidated, or to compensation for said rights."

The act says in substance " that for all water diverted over and above fifteen thousand one hundred cubic feet per second, the petitioner shall pay therefor an equitable rental (as shall) hereafter be provided by law."

Chapter 242 of the Laws of 1922, being subdivision 13 of section 614 (formerly 613) of the Conservation Law (Cons. Laws, ch. 65), made the provision for the rental or charge. It reads:

" General powers and duties of the commission in relation to water power. (L. 1928, ch. 242, § 39.) The commission [Water Power and Control Commission] * * *

" 13. Shall have the power to fix and determine, after a hearing held upon notice to the parties interested, the amount of an equitable rental, which is hereby charged pursuant to the reservation made by chapter five hundred and ninety-seven of the laws of nineteen hundred and eighteen, for the diversion, as specified in such chapter, of water from the Niagara river in excess of a daily diversion at the rate of fifteen thousand one hundred cubic feet per second, and which shall be fixed in like manner as if the application was made for a license under the provisions of this article before the water was used, and the people of the state may sue for and collect in behalf of the state such rental as so fixed and determined."

Congress, on July 12, 1919 (41 U. S. Stat. 163), by a joint resolution allowed permits to be issued up to the 1st day of July, 1920, for the use of not to exceed 20,000 c. f. s. of Niagara water. Permits were issued to the Niagara Falls Power Company for 19,500 c. f. s. and another to the Hydraulic Race Company for 500 c. f. s.

By the Federal Power Act (41 U. S. Stat. 1063), approved June 10, 1920, the waters of Niagara river were placed under the control of the Federal Power Commission. This Commission permitted the diversion of 19,500 c. f. s. to the Power Company, and 500 c. f. s. to the Hydraulic Race Company. Thus the entire amount of 20,000 c. f. s. of Niagara water has been diverted by the petitioner, which is the limit allowed by the treaty, and is 4,900 c. f. s. over and above that which it may withdraw under the act of 1918 without paying any compensation or water charge to the State. Four thousand, four hundred c. f. s. have been withdrawn from this litigation by agreement as to compensation or rental value, leaving the 500 c. f. s. to be charged for by the Commission in accordance with the above provisions. For the time specified in the record, the Commission, after a hearing, has fixed a rental value or reasonable charge for this excess of 500 c. f. s. at five dollars per horse power.

With this statement of the facts we now come to the law which governs the case. The petitioner claims that by the acts of 1892, 1893 and 1896, it had a grant from the State to rights in the Niagara river of which it could not be divested by subsequent acts, and that it could withdraw 20,000 c. f. s. without paying for it. The answer to this is that the acts permitting the withdrawal of water were subject to the reserve power of the State to regulate and control the use in behalf of the public, and the privileges and rights granted to the power company were taken subject to this right of the State and also subject to the control of Congress. The power of Congress to regulate this river is unquestioned because the petitioner does not insist that it can take all the water allowed by the acts of 1892, 1893 and 1896, as it is limited by the treaty with Great Britain and also by the control of the Federal Power Commission. In other words, it lays claim to no greater right than 20,000 c. f. s. But the control of Congress and the control of the State are joint (*Montgomery* v. *Portland*, 190 U. S. 89; *United States* v. *River Rouge Co.*, 269 U. S. 411, 419), so that the State likewise has the reserve power to preserve the water of Niagara river for commerce and navigation and in the interests of the public. Therefore, the limitation stated in chapter 597 of the Laws of 1918 was and is binding upon this petitioner. The word " rental " is by no means limited or intended to be used in connection with real estate or lands, tenements and hereditaments conveyed by the State. It has reference to a rental charge for the use of water, and such is its meaning in chapter 597.

Again, the present petitioner, reorganized under chapter 596, accepted all the privileges and benefits of that act, and is bound by all the obligations which it assumed in so doing and as stated in chapter 597.

We are thus brought to the conclusion that the right of the State to collect an " equitable rental " may be

sustained independently of any other reason, upon the provisions of chapters 596 and 597, Laws of 1918.

Taking up, then, the question of the equitable rental to be paid, we find that chapter 597 of the Laws of 1918 did not, in and of itself, provide a method of assessment of the equitable rental but expressly provided for subsequent legislative enactment prescribing such method. This the Legislature subsequently enacted (L. 1922, ch. 242), thereby conferring upon the Commission the power of determining an equitable rental.

The provision in the statute (§ 614, subd. 13, *supra*) that the rental shall be fixed " in like manner as if the application was made for a license " simply means that the procedure employed in the issuance of licenses is applicable. (Conservation Law, § 616, subd. 1.) It cannot be construed to mean that the amounts and kind of rental found in the licensing section (§ 616) are to be bodily lifted out of that section and incorporated into section 614, subdivision 13. The reference is made, not to qualify the substance of subdivision 13 but merely to provide a means for formal execution.

This conclusion is confirmed by a consideration of the result of treating section 614, subdivision 13, as incorporating the substantive portions of section 616. Subdivision 2 of that section provides for a " fair rental value " charge where title to the power site is vested in the State; " an equitable annual charge " where the State has some proprietary interest; and an administrative charge in all cases, including where the State has no proprietary interest. Thus, the statute comprehends three situations, the first where the State owns the power sites, the second where it does not own the sites but has some proprietary interest in them, and the third where it has no proprietary interest at all — for example, as in a private non-navigable stream. The power company contends that the State has no proprietary interest in the sites. How great is the State's proprietary interest in these sites in the navigable

Niagara river, it is unnecessary to determine, since the State has a valid claim to an equitable rental for this fraction of the total amount of water diverted, based upon the acceptance of the provisions of the law of 1918 (Ch. 597). The power company asks us to conclude that the State is only entitled to an administrative charge. Certainly more was intended than the ordinary administrative charge when the Legislature used the term "equitable rental" in the law of 1918 (Ch. 597) and in section 614, subdivision 13, of the Conservation Law. Moreover, if the intention were to incorporate more than the procedural provisions of section 616 there would have been no need for the subsequent enactment of section 639 of the Conservation Law, requiring the company to obtain a license.

As there was evidence before the Commission bearing upon the reasonable value or rental value for the use of this water, neither the Appellate Division nor this court has any power to reconsider the question. No doubt much administrative law has grown up in this State and in this country in response to the development of the public utility resources, but, unless these administrative agencies act arbitrarily and beyond their powers, the courts should not interfere. We have no special knowledge which enables us to deal with these matters. On the other hand, the Commission is a fact finding body of presumed technical qualifications. The Power Commission has been intrusted by the Legislature to deal with these specialties and as long as they act in accordance with the due administration of law by affording a hearing, taking evidence and giving their judgment or award, we cannot, nor must the Appellate Division, interfere with their conclusion. We, therefore, conclude that the Water Power and Control Commission acted within its powers when fixing this rate for the 500 c. f. s. used in excess by the petitioner, and that its decision should not have been disturbed.

There are other questions arising which we do not deem it necessary to consider, such, for instance, as the constitutionality of the acts of 1892 and 1893 and 1896, and further, the power of the State at any time to give away to private parties for commercial enterprises the sole use of navigable rivers or the diversion of the waters therein.

Without passing upon these questions, and basing our decision solely upon the points above discussed, the decision of the Appellate Division should be reversed; that of the Water Power and Control Commission affirmed, with costs in all courts, and the question certified answered in the negative.

CRANE, Ch. J., LEHMAN, O'BRIEN, HUBBS, CROUCH and LOUGHRAN, JJ., concur.

Ordered accordingly.