NIAGARA FALLS POWER COMPANY, Plaintiff, v. PERRY B. DURYEA et al., Constituting the Water Power and Control Commission of the State of New York, et al., Defendants.

Supreme Court, Special Term, Albany County, September 19, 1945.

*Joseph M. Proskauer, Randall J. Le Boeuf, Jr., J. Alvin Van Bergh* and *Chauncey P. Williams, Jr.,* for plaintiff.

*Nathaniel Goldstein, Attorney-General (Orrin G. Judd, Wendell P. Brown, Ruth K. Toch, John R. Davison* and *Daniel J. Loventhal* of counsel), for defendants.

BERGAN, J. The Niagara Falls Power Company for many years has been a user of substantial quantities of water from the Niagara River for power purposes. By operation of law as a riparian owner and by virtue of specific legislative grants and certain State patents, it claims to have acquired a property right in the use of 15,100 cubic feet per second. In 1943 the

Legislature by law asserted the priority of the State to this water and directed that an equitable rental be paid for its use. (L. 1943, ch. 46.) The Water Power and Control Commission which was required by the statute to fix the amount of the rental, gave notice of a proceeding for this purpose.

Plaintiff brings this action for a declaration under article 15 of the Real Property Law that the 1943 act is invalid insofar as it imposes a rental upon the water which plaintiff claims it takes as a vested property right. This is the first direct legislative challenge of this right. The history of the controversy between the State and private interests over the use of the energy of Niagara Falls is long and involved. But an acquaintance with some of the factual background is essential to an understanding of the nature and scope of this controversy.

In 1805 the State owned a strip of land a mile in width, adjoining the Niagara River in the Niagara Falls area. This land was reserved by New York when the settlement was reached with Massachusetts in 1786 in the dispute over sovereignty and title to lands in western New York. In 1805 the State sold lots from this land at public auction. Augustus Porter and Peter B. Porter were purchasers of some of the lots along the river bank. There were later acquisitions by the Porters and their associates. The State made no reservation in the deeds in relation to the use of water.

The intended use of this property for hydraulic purposes by a canal diversion of water around the falls was publicly advertised and was a notorious fact. The project met with difficulty, but a canal ten feet deep and seventy feet wide, started in 1853 by a hydraulic company which was unable to continue the work, was completed in 1857 by the Niagara Falls Water Power Company which had acquired the Porter title and certain other rights in the projected and uncompleted canal project.

The physical diversion of water around the falls, thus begun in 1857 has since been open and continuous. The water was at first used to generate mechanical power for industrial purposes. The canal rights were acquired in 1879 by the Niagara Falls Hydraulic Power and Manufacturing Company. A primitive hydroelectric generating station was established in 1881. In 1883 the State acquired by condemnation riparian land below the intake of the canal, to be used for the Niagara Reservation. Three years later the State for a good consideration, granted title to the canal company to certain land under water in the river at the intake of the canal for the disclosed purpose of facilitating the operation of the canal.

In 1896 the Legislature enacted a statute (L. 1896, ch. 968) which has acquired significance in controversy between the parties. This " recognized, declared and confirmed " the right of the company to take water out of the river, but limited the quantity. Although it had started in the development of the hydroelectric capacities of Niagara in the small generator of 1881, the development of Niagara hydroelectric power was begun by the company after 1896 on a very large scale.

A second station was installed which ultimately had a capacity of 30,000 horsepower. It utilized the full head of 210 feet of water, under pressures and conditions that had never theretofore been employed anywhere in the world. Machinery was designed or purchased which made it possible to utilize the great drop of the falls in the production of abundant and cheap electric energy. Within ten years of the 1896 statute, a third station was commenced designed to generate 130,000 horsepower.

The period was one of rapid expansion in the use and value of electricity in industry, and the canal company enlarged its facilities accordingly. Before 1896, the company expended $450,000 in the project, and from the time of the 1896 statute, and on the strength of it plaintiff says, to 1918, the canal company spent an additional $7,000,000 in development.

In 1886 the Legislature incorporated the Niagara River Hydraulic Tunnel Power and Sewer Company of Niagara Falls (L. 1886, ch. 83). Its purposes included a somewhat disingenious " public use " of providing " sewerage and drainage ", but it also could furnish " hydraulic power for manufacturing purposes ". The company acquired riparian land and lands under water. Its early concern was with mechanical power. The development it contemplated was on a large scale and would have utilized water power in quantities and under conditions not tried before that time. The development of electric energy was then in an uncertain stage. The efforts of the company to find the most feasible direction for its development, tended to stimulate creative effort in the field.

In 1892 the Legislature enacted a statute (L. 1892, ch. 513) which provided that the tunnel company (referred to as the Niagara Falls Power Company) should have the " right to take and use the waters of the Niagara river " to the extent required for its works, limited to a quantity sufficient to produce 200,000 effective horsepower. The condition upon which this right was granted by the Legislature was that the company was to furnish free of charge electricity and water to the State at the Niagara Reservation when requested by the commissioners.

The Attorney-General (Simon W. Rosendale) whose advice was sought by the Niagara Reservation commissioners while the bill was pending before the Legislature was of the opinion that in view of the stated " consideration " for " the franchise " a contractual relation " will doubtless be claimed by the corporation " and this " with much force " in view of the legal decisions on the subject.

The tunnel was completed in 1892 and by 1895 three water turbines each of 5,000 horsepower capacity were installed. The company decided to use alternating current for the generation and transmission of electric power, notwithstanding the strongly adverse opinions of some of the leading men in the field. There was, however, respectable authority supporting the use of this type of current. Prior to the enactment of the 1892 statute, the tunnel company and its associate had spent $2,000,000 in the project. Between 1892 and 1918, the tunnel company spent $9,000,000 more.

In 1906 Congress limited the diversion of water on the American side of the river. In the licenses issued by the Federal Government, the tunnel company was limited to 8,600 cubic feet per second and the canal company to 6,500 cubic feet per second. The total diversion permitted for the two companies of 15,100 cubic feet per second has significance in the case. In the first World War, the shortage of electric energy for war industry and particularly in the chemical industry became very acute. The Federal diversion licenses were increased to 18,785 cubic feet per second, but this was not enough. The United States suggested that steps be taken to increase the supply of available hydroelectric power at Niagara. It was decided to unite the companies and a third small company, and to pool and enlarge their facilities. The Government agreed to give a long-term Federal license to divert 19,500 cubic feet per second. The Legislature consolidated the three companies (L. 1918, chs. 596, 597). The plaintiff is the successor. This act authorized new and improved construction in connection with the water which the new company would be allowed to use. It prohibited diversion in excess of the total authorizations which had theretofore been made by the State. It reserved the right of the State to " charge an equitable rental " for the diversion of water in excess of 15,100 cubic feet per second which had been the prewar limit of the tunnel and canal companies under Federal licenses. Finally, the statute provided that it was not to be deemed a waiver of any existing right of the State to the water then being diverted by the companies or of compensation for that right.

The facilities were enlarged and improved by new construction and installation. Over $1,000,000 was spent between April and October, 1918, alone, and the improvements made since the 1918 statute, and, plaintiff contends, in reliance on it, exceed $20,000,000. The general plan of 1918 to increase efficiency and output in the production of power has been followed. The electric energy produced is probably the cheapest in the world. It has aided in the industrial development of the area and of the State.

Within three years of the 1918 statute, the Legislature enacted the Water Power Act (L. 1921, ch. 579). This act, now article XIV of the Conservation Law, provided for licensing water power developments. Among other things, the act prohibited a diversion of water " without right lawfully and previously acquired " unless by license from the State, and declared such a diversion to be a misdemeanor (§ 633 of the original Act; now Conservation Law, § 634). The statute by an amendment in 1922, also imposed a charge for the use of the water in excess of 15,100 cubic feet per second under the reservation made in the 1918 statute. The rate was fixed by the Water Power and Control Commission. Its right to do so was denied by the plaintiff. The case reached the Court of Appeals in 1935 (*Niagara Falls P. Co.* v. *Water P. & C. Comm.*, 267 N. Y. 265). It was held that the State had the right to collect a rental for the use of water in excess of 15,100 cubic feet per second on the basis of the 1918 statutes alone, the conditions of which had been accepted by plaintiff, but there were very much broader implications in the decision which seemed to open to debate the basic right of the company to divert when opposed to the sovereign's rights in these waters (see p. 276).

Perhaps because of the implications in this decision, the State for the first time in 1937 challenged the right of the plaintiff to use the basic 15,100 cubic feet per second without its license under the Conservation Law. The statute was not amended. An action was maintained by the Water Power and Control Commission under the provisions of the existing statute which prohibited the unlicensed diversion of water " without right lawfully and previously acquired ". The court on December 10, 1942, held that the company fell within the definition of a user having a right lawfully and previously acquired, and therefore was expressly excepted by the words of the statute (*Water Power & Control Comm.* v. *Niagara Falls P. Co.*, 289 N. Y. 353).

Within a few months of this decision the Legislature adopted amendments to the water power article of the Conservation Law

clearly designed to assert the priority of the State to the use of the water without regard to any pre-existing or accumulated use by any private interest (L. 1943, ch. 46). It imposed a reservation upon the use of any water in which the State has control or interest, however the use was acquired. Any such use would remain subject to the control or termination by the State, and subject to a rental (§ 612). It expressly required that an equitable rental be imposed on the basic 15,100 cubic feet per second described in the 1918 statute (§ 614, subd. 13). It eliminated the " without right lawfully and previously acquired " from the exception to the penal provisions of the article (§ 634). It terminated the rights of any user claiming through a legislative act or grant, and required all such users to be licensed under the Conservation Law. An exception in the former statute which would protect the plaintiff and other users similarly situated was repealed (§ 639).

Whatever may have been the uncertainties of legislative policy when the question was previously litigated under an administrative purpose to subordinate the right of the plaintiff to use the waters of Niagara to the paramount right of the State, there is now no remaining doubt. The Legislature has asserted in unmistakable language that the right of the State to the energy of Niagara Falls comes before any private right that has been acquired by the plaintiff by usage or law. There is no need for judicial construction of language as plain as this. It can mean only one thing. The essential question is whether the company has acquired a " property " right in the use of the water which may not be taken away by the Legislature without compensation.

The plaintiff contends that a right of diversion exists in the Niagara in its favor, even though it may be conceded that the State has some proprietary right in the bed and waters of the river and some jurisdiction over them. The right of diversion exists, so the argument goes, because of the riparian ownership of the bank of the river with the consent to the use of the water by the State as downstream riparian owner and owner of the bed and the waters; because of the title to land under water acquired by the plaintiff from the State, and because of the specific grants of right by statute.

The Attorney-General questions the right of the plaintiff to take water as a riparian owner because of adverse downstream rights. He contends that the statutes of 1892 and 1896 are not to be construed as irrevocable grants or to be treated as creating property rights; and finally if they are to be construed as irrevocable in purpose, such a grant would be beyond the power of the Legislature.

The ingenuity of counsel on both sides has discovered many quotations from judicial opinions which seem to sustain, respectively, fundamentally opposite views. In few subjects must greater care be taken to look behind what was written to ascertain what was decided, than in the subject of the rights to use of water in public streams in New York. The general harmony of the cases on water rights becomes more apparent if attention is confined rigorously to what was before the court and what was decided, but even with this process it is not always possible to reconcile some decisions. *Gould* against *Hudson River Railroad Company* (6 N. Y. 522) is one example.

The area in which the sovereign takes precedence over the riparian owner in public waters is very broad. No damage arises from interference with riparian rights where a public use in the interests of commerce as well as navigation may be discernible (*Matter of City of New York* [*Jamaica Bay*], 256 N. Y. 382, 385). A " marginal street or wharf " was held to be an undertaking by which the sovereign could destroy riparian rights without compensation; but the making of filled land to be sold for private purposes or to be used for city purposes other than commerce or navigation would require compensation to riparian owners.

Where the State owns the bed of the stream, it is not answerable to a riparian owner for the diversion of the water (*The People* v. *The Canal Appraisers*, 33 N. Y. 461). The diversion there was for the public use of the State for canal purposes. The decision does not seem to turn on the nature of the public use, but on the general precedence of the State over a private riparian owner. But where the upland of the riparian owner is taken by the State for barge canal purposes, which would presumably be a sovereign act in the interests of navigation, the " ordinary riparian rights " in a navigable river incidental to the land taken must be paid for (*Danes* v. *State of New York*, 219 N. Y. 67, 76). In the same general direction is *Waterford El. L., H. & P. Co.* v. *State of New York* (208 App. Div. 273).

Other rules apply when the State is not the owner of the bed of the stream and when the stream is not composed of public waters in the sense that the Hudson and Niagara are public waters. In such a case the State may act to improve navigation in the natural channel without compensating the owners of the bed and bank, but even to improve navigation it cannot divert the channel without paying damages (*Fulton L., H. & P. Co.* v. *State of N. Y.*, 200 N. Y. 400). Where the bed (of a lake) is privately owned, water may not be diverted, except for navigation, even though the use may be for another public purpose,

as a municipal water supply (*Smith et al.* v. *City of Rochester,* 92 N. Y. 463).

The Niagara River is a public and international boundary stream, the bed of which is owned by the State and the water subject to its control, and it is treated as a navigable stream even at the point of the falls (see *Niagara Falls P. Co.* v. *Water P. & C. Comm.,* 267 N. Y. 265, *supra*). There can be no doubt of the right of riparian owners to use this water, but when the use of the water is resisted by the State in the interests of navigation, the private use must certainly yield to the sovereign's judgment of necessity. In addition to its power to control and regulate navigation, the State has general rights of regulation of the water in the public stream in which it owns the bed. The important point in this case is whether this kind of power, exercised over the water by the sovereign, beyond the point of controlling navigation, is the kind of power which cannot be yielded beyond reassertion, under any contract, license or consent between the State and a private citizen.

In granting rights to lands under public waters, the sovereign always does so with the limitation, whether expressed or not, that its public functions and obligations in the water cannot be impaired. The State cannot yield this part of its sovereign and public obligation.

Even when the grant to land under water is very ancient, and has been exercised for long periods, the land may be interfered with by dredging in the interests of navigation (*Lewis Blue Point Oyster C. Co.* v. *Briggs,* 198 N. Y. 287). A grant of land under water at Staten Island for the purpose of commerce and navigation was held to be subject to the exercise by the State of its power, in the interests of navigation, to regulate the size, form and location of piers (*People* v. *N. Y. and S. I. F. Co.,* 68 N. Y. 71). A naked grant of the entire foreshore along the ocean in Queens County by a colonial governor, not apparently in the interests of commerce or navigation, is invalid because it is against public policy (*Marba Sea Bay Corp.* v. *Clinton St. R. Corp.,* 272 N. Y. 292).

Sometimes the underlying invalidity of the grant or delegation of power over water is exposed by the repeal of the statute. Three decisions on this subject are illustrative. In *Coxe* v. *State* (144 N. Y. 396) a grant of extensive land under water for the purpose of drainage and reclamation, invalid because of the method of statutory adoption, was treated as the kind of a grant which in any event may be withdrawn by the repeal of the statute. The granting of a large concession in land under public water in Chicago for a valuable consideration passing to

the State, is revocable by statutory repeal, because the sovereign cannot surrender effectively its trust in the development of this public water for the purposes of commerce and navigation. (*Illinois Central Railroad* v. *Illinois*, 146 U. S. 387.) A grant to a corporation in the waters of the St. Lawrence for the purposes of commerce and the development of power and for a valuable consideration passing to the State is invalid and may be repealed because it incidentally contained a condition that the obligation to preserve navigation should be assumed by the corporation — an obligation which the court thought not to be subject to any delegation (*Matter of Long Sault Development Co.,* 212 N. Y. 1).

Merely because the power to act in the interests of navigation arises so often in litigation and is so often suggested as a form in which the sovereign power in public water is to be exercised above private rights, it is not to be supposed that this is the only form in which public powers are to be exercised over public waters and to which private interests may be required to yield. The Supreme Court in the *Illinois Central* case (*supra*) intimated that this public trust was of an extremely broad character, and in *Matter of City of Syracuse* v. *Gibbs* (283 N. Y. 275), the statutory grant of the right of a city to use water for its waterworks was subjected to the duty of the State to control and conserve its water resources for the benefit of all its inhabitants, and it was thought that any broader statutory grant of rights to the water would be invalid and unconstitutional.

The power of the State so to dispose of its water resources that they shall be distributed in the public interest notwithstanding special statutory provisions, special grants or special rights was treated as the " reserve power " of the State in *Matter of City of Syracuse* v. *Gibbs* (*supra*). It is the same " reserve power ", I think, that Judge FINCH referred to in *Niagara Falls P. Co.* v. *Water P. & C. Comm.* (267 N. Y. 265, 276), when he used the expression " the reserve power to preserve the water of Niagara river for commerce and navigation and in the interests of the public." I am unable to distinguish the power of the State thus expressed, over public water in the public interest and its power in the interest of navigation. I do not think they are distinguishable. No one would doubt that the State could interfere with the plaintiff's riparian rights, or even destroy them in the interest of navigation in the river. And it is not very much more doubtful that if the State has the power to act in the preservation of public water in the public interest,

it may do so in the direction of preserving to the people the energy of Niagara Falls by a clearly expressed statute for that purpose regardless of the rights it may have previously created, permitted or allowed in these waters. I do not think the issues presented by this case can be met on any other or narrower ground than this.

There are some hard elements in this reassertion now by the State of a first right to this great natural energy. The plaintiff must trust that the rental will be truly equitable. But the whole dealing of the State with the company for half a century and more has been marked by fairness, and, indeed, in the grants it gave for trivial consideration, by marked liberality. The company took risks; it developed the art of generating electricity; it worked a resource that had lain fallow and so it contributed to the development of the State, but countless others have by their energy and thought and risk-taking built this commonwealth, and it is for them as well as for the plaintiff that the Legislature has now asserted the sovereign right to this natural resource.

Niagara Falls is one of the prime natural resources of the State. It can scarcely be believed that the Legislature in granting rights to use its energy, and the company's predecessors in accepting the rights given, believed that this natural resource was being placed for all time by the crystallization of contractual obligations beyond the control of the people of the State. The companies and the Legislature in their arrangements were bound as reasonable men to anticipate, and I think they did anticipate, that the " title " to the perpetual use of a natural resource of the very first magnitude might be disavowed by differently minded men in future times, by men who might feel that resources of this kind are inalienable and who would be unwilling that another generation bind them irrevocably in the use to be made of them.

It is a commonplace of history that emphasis upon resources of a country changes from generation to generation and no enlightened State has ever allowed crippling and endless limitations to be imposed on its resources. The precautionary words in the statutes of 1892 and 1896 and the guarded comment of Attorney-General Rosendale of what will " doubtless be claimed " all lead to the conclusion that the men who were dealing with Niagara had some substantial misgivings about the ability of the Legislature to give away the energy of Niagara safe from the disavowal of another generation.

These considerations lead me to grant judgment for the defendants. Submit decision and judgment.