The People of the State of New York et al., Appellants, *v.* System Properties, Inc., et al., Respondents.

Third Department, March 12, 1953.

*Nathaniel L. Goldstein, Attorney-General* (*Wendell P. Brown, Solicitor-General, Edward L. Ryan* and *Donald C. Glenn* of counsel), for People of the State of New York, appellant.

*Richmond D. Moot* for Irving Langmuir and others, appellants.

*Randall J. Le Boeuf, Jr., Chauncey P. Williams, Jr.,* and *Halcyon G. Skinner* for System Properties, Inc., respondent.

*Charles H. Tuttle* for Lake George Association, respondent.

*Beecher S. Clother* for County of Warren and others, respondents.

*Edward R. Waite* for County of Washington and others, respondents.

*F. Morse Hubbard* for Elizabeth G. Brereton, respondent.

*Sheldon F. Wickes* for Town of Ticonderoga, respondent.

*John W. Whiteley* and *Dominic J. Viscardi* for Village of Ticonderoga, respondent.

*B. Gregory Brewster, County Attorney* (*Albert Krakes* of counsel), for County of Essex, respondent.

HALPERN, J.   This action was originally brought by the People of the State of New York for a judgment decreeing and declaring that the State was the owner of the bed of Lake George and of the Ticonderoga River, the outlet of Lake George, and that the State had the paramount right to control the use of the waters of Lake George and the Ticonderoga River and to regulate the water level of the lake.   The State also sought a judgment restraining and enjoining the defendant System Properties, Inc. from maintaining a dam in the Ticonderoga River which had the effect of raising the level of the waters of Lake George, and directing the defendant forthwith to remove the dam.

Subsequently, the Lake George Association, which is composed of several hundred riparian owners on the shores of Lake George, intervened on the side of the defendant.   Thereafter, the individual plaintiffs, other riparian owners, intervened on the side of the plaintiff.   Various municipal corporations, as indicated in the title, intervened on the side of the defendant.

Upon the opening of the trial, the Attorney-General withdrew all prayers for relief except the prayer for a declaratory judgment.   He specifically withdrew any demand for a judgment requiring the removal of the dam.   The Attorney-General took the position that, after a determination of the State's rights had been made, it would be for the Legislature to decide what course of action should be taken in the public interest, in the light of the court's decision.

The plaintiffs-interveners were not satisfied with the State's position and by permission of the court they thereupon amended their pleadings so as to seek on their behalf a judgment directing the removal of the dam.

The dam now owned and maintained by the defendant System Properties and known as dam A is located at the brink of the upper falls in the Ticonderoga River.   The Ticonderoga River is the sole outlet of Lake George and the river in turn empties into Lake Champlain.   There is a drop from the source of the Ticonderoga River to Lake Champlain of about 221 feet.   The dam serves the function of holding back the waters of Lake George and converting it in effect into an enormous reservoir. The waters of the spring floods are stored for use in the drier seasons.   This helps to stabilize the water level of the lake and also aids in the development of water power at the dam site. A penstock leads from the forebay of the dam and conveys water to the hydroelectric plant of the lessee of the defendant

System. The dam has the effect of raising the level of the water of Lake George about one foot and one half above the level which would otherwise have obtained.

The trial of the action consumed several weeks in the summer of 1945. The court's decision was handed down on September 4, 1947, and judgment was entered thereon on April 6, 1948.

The trial court's decision contained the following findings of fact:

(1) Lake George is a navigable body of water in fact and in law;

(2) The Ticonderoga River is not a navigable body of water either in fact or in law;

(3) Title to the bed of the river at the site of the dam is in the defendant System Properties;

(4) The presence and operation of the dam in Ticonderoga River affect the water level of Lake George and the artificial water level so created has a direct effect and bearing upon navigation in the lake.

The court seems to have recognized that by virtue of the navigable character of Lake George, the State originally had the paramount power to regulate and control the water level of the lake but its conception of this paramount right seems to have been a narrow one, the right according to the court's view being limited to regulation in the interest of navigation to the exclusion of other public interests. The court also seems to have assumed that it was possible for a prescriptive right to be acquired superior to the State's power of regulation.

The court, however, found it unnecessary to decide whether the defendant System had acquired such a prescriptive right or whether equitable considerations protected it against the exercise of the State's power, for the reason that, in the court's opinion, regardless of the resolution of these questions, it was in the best interests of all the parties to have the defendant System continue to maintain and operate its dam, provided that the dam was so operated that the range of fluctuations of the water level of Lake George was kept within certain limits prescribed by the court. The limits prescribed were elevations between 4.0 feet and 2.5 feet on the Rogers Rock Gauge, between June 1st and October 1st in each year (equivalent to elevations 319.93 feet above mean sea level and 318.43 feet above mean sea level). During other seasons of the year, the water levels were to be raised or depressed, as might be necessary in order to achieve in the next following year the levels fixed for the

summer months and " to satisfy the economic requirements of the defendant System Properties, Inc., with due regard for the rights of the owners of shore property along Lake George ". The court declared that the operation of the dam prescribed by it " is best calculated to serve all public and private interests affected thereby, and is advantageous to such interests and reasonable with respect thereto ".

The maximum and minimum elevations prescribed by the court followed substantially the so-called " Gentlemen's Agreement " of 1935 in which the Conservation Commissioner, the defendant System and various property owners had participated.

For the purpose of enforcing the court's decree, the court appointed the Superintendent of Public Works of the State of New York and his successor in office from time to time as agent of the court to supervise the maintenance and control of the water levels, the procedural details of the operation to be decided by the Superintendent and a representative of the defendant System, subject to the approval of the court.

The court thus in effect held that even if the State had the paramount power to regulate the water level of Lake George, the court had the right to act for the State and to declare what changes of the water level should be permitted, and it accordingly authorized the defendant System to continue to maintain and operate the dam, subject to the restrictions which the court imposed. The court thus assumed the right to decide how the State's sovereign power should be exercised and to make a final disposition of the controversy in accordance with its views as to what was " best calculated to serve all public and private interests ".

We recognize that the trial court was motivated by a desire to arrive at an equitable solution of what had long been a troublesome problem but the solution which it adopted was beyond its power.

The sovereign power of the State is vested in the Legislature and not in the courts. If the State has the paramount power to regulate the water level of Lake George, it is for the Legislature to say what shall or shall not be done in the exercise of that power. Whether the defendant System should be given permission to continue to maintain the dam and, if so, upon what terms and conditions and subject to what restrictions, — these are all questions for the Legislature to decide either directly or through an administrative agency to which it may delegate its power. There has, of course, been no delegation by the Legislature to

the courts of authority to decide matters of this kind (*People* v. *Delaware & Hudson Co.,* 213 N. Y. 194, 202).

We are not here dealing with the power of the court to grant interim relief to preserve the *status quo* pending action by the Legislature or to give a temporary stay to allow the defendant a reasonable time within which to remove a structure found to be illegal (cf. *Wisconsin* v. *Illinois,* 278 U. S. 367). The trial court did not purport to grant only temporary relief but undertook to substitute its judgment for that of the Legislature and to impose a permanent solution of its own choosing to be carried out under its continuing supervision and control. And the court gave the imposition of this solution as its reason for declining to decide the underlying rights of the parties. This we cannot approve.

It thus becomes necessary to decide the questions which the trial court declined to decide, namely, whether the State had the paramount power to regulate the level of the water of Lake George in the public interest and whether the State has lost that power as the result of the passage of time or of inaction on its part.

Our conclusions may be succinctly stated:

(1) The State is the owner of the bed of Lake George in its sovereign capacity and it has the paramount power to control and regulate the use of the waters of the lake in the public interest. (Cf. *Matter of City of Syracuse* v. *Gibbs,* 283 N. Y. 275 and *Granger* v. *City of Canandaigua,* 257 N. Y. 126.) This necessarily embraces the power to determine the level of the water of the lake and, as an incident to that power, the State has the right to control, license or forbid the maintenance and operation of any obstruction in the outlet of the lake. (*Sanitary District* v. *United States,* 266 U. S. 405.)

(2) The sovereign power of the State is not limited to regulation in the interest of navigation but extends to every form of regulation in the public interest, including the regulation of the use of the lake as a means of recreation and enjoyment and as a source of water power. We adopt as expressing our views the exposition of the scope of the State's power written by Justice BERGAN when he was at Special Term in *Niagara Falls Power Co.* v. *Duryea* (185 Misc. 696, 705): " Merely because the power to act in the interests of navigation arises so often in litigation and is so often suggested as a form in which the sovereign power in public water is to be exercised above private rights, it is not to be supposed that this is the only form in which public powers

are to be exercised over public waters and to which private interests may be required to yield. * * * It is the same ' reserve power ', I think, that Judge FINCH referred to in *Niagara Falls P. Co.* v. *Water P. & C. Comm.* (267 N. Y. 265, 276), when he used the expression ' the reserve power to preserve the water of Niagara river for commerce and navigation and in the interests of the public.' I am unable to distinguish the power of the State thus expressed, over public water in the public interest and its power in the interest in navigation. I do not think they are distinguishable."

(3) No prescriptive right can be acquired against the sovereign power of the State to regulate and control the use of navigable waters. The State holds this power in its sovereign capacity in trust for the people of the State. The sovereign powers of the State cannot be lost or barred by the passage of time or by any inaction on the part of the State. Neither can the State be estopped on any equitable grounds from exercising its sovereign powers.

The claim of defendant System that it had acquired " a flowage easement as against all interests in the lake " by the passage of time must therefore be rejected. (*Burbank* v. *Fay,* 65 N. Y. 57, 66–67; *People* v. *Baldwin,* 197 App. Div. 285, 288, affd. 233 N. Y. 672; *Hinckley* v. *State of New York,* 234 N. Y. 309, 315; *City of New York* v. *Wilson & Co.,* 278 N. Y. 86, 97.)

As we have already indicated, the State's sovereign power is not vested in the courts. The Legislature or its delegate has the sole authority to determine what should or should not be done in the exercise of the State's sovereign power. The Legislature may well decide to authorize the continued maintenance of System's dam and it may well decide to prescribe the same range of fluctuations of the water level of Lake George as that prescribed by the court (cf. the bill passed by the Legislature in 1945 but vetoed by the Governor, Assembly bill, Intr. No. 1264, Pr. No. 2034) or it may decide that the whole problem should be entrusted to an appropriate executive officer or board for determination and regulation. Nothing in this opinion is intended to indicate any view that the existing water levels should be changed; that is a matter which is not within our province; all that we hold is that the Legislature has full and unimpaired power to determine the water level of Lake George and to determine the nature and method of operation of any structures which may affect that level.

The foregoing conclusions are in no way dependent upon a finding that the Ticonderoga River is navigable or that the State has any title to its bed. The State has the power to control, to license or to forbid, structures in tributaries of navigable waters or in outlets therefrom even though the tributaries or outlets are themselves nonnavigable, if the structures have an effect upon the navigable waters (*Sanitary District* v. *United States,* 266 U. S. 405, *supra; Amory* v. *Commonwealth,* 321 Mass. 240; *United States* v. *Appalachian Power Co.,* 311 U. S. 377).

However, separate issues were tendered in this action as to the navigability of the Ticonderoga River and the ownership of its bed and we pass to the determination of those issues, for whatever bearing they may have upon the extent of the State's authority and the scope of permissible regulatory legislation.

Upon a review of the record, we find ourselves unable to accept the trial court's conclusion that the Ticonderoga River is nonnavigable. We adopt the suggestion of counsel for the defendant System that, for convenience of discussion, the river may be considered as consisting of three parts. The first part, which he calls the Lake George Outlet, runs about three quarters of a mile from the Natural Dam, a rock formation at the foot of the lake, to the Upper Falls where the defendant System's Dam A is located. The middle part of the river, which defendant's counsel terms Ticonderoga Creek, is about one and one-quarter miles long and runs from the Upper Falls to the foot of the Lower Falls; there are four additional dams along this part of the river, connected with hydroelectrical plants owned by the defendant System and all interconnected with each other and with the plant at Dam A. The remaining part of the river extends about a mile and one half from the foot of the Lower Falls to Lake Champlain; the defendant's counsel calls this part Ticonderoga Bay. This part of the river is at the same level as Lake Champlain and is concededly navigable. The middle part is concededly not navigable since in its natural state it was interrupted by a series of rocky cascades and in its present state is blocked by a series of dams.

The controversy relates to the first part, the immediate outlet of Lake George. In its present state, it is concededly navigable, since it continues with a very slight grade at the same level as Lake George to the head of the Upper Falls, but the defendant maintains that this is attributable to the impounding of the waters by the dam and that in its natural state this part of the river was not navigable. It appears that at an early,

undetermined time one of the channels of the Natural Dam was deepened by the removal by dynamiting of a small quantity of rock and thereafter passage from Lake George into the Ticonderoga River was concededly possible. There is a dispute as to whether such passage was possible before the dynamiting but the early records in evidence establish that it was. There is a reference to a portage during the Revolutionary War from a point in the river near the Upper Falls to a point below the Lower Falls. This was obviously before there was any dynamiting and before any dam had been built. Furthermore, even if a slight deepening of the channel at Natural Dam was required in order to make it possible to proceed by boat from Lake George into the river, the river was navigable in fact under the modern test of navigability promulgated by the United States Supreme Court. (See *United States* v. *Appalachian Power Co.*, 311 U. S. 377, 407–408, *supra*): "To appraise the evidence of the navigability on the natural condition only of the waterway is erroneous. Its availability for navigation must also be considered. 'Natural and ordinary condition' refers to volume of water, the gradients and the regularity of the flow. A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken. * * * The district court is quite right in saying there are obvious limits to such improvements as affecting navigability. These limits are necessarily a matter of degree. There must be a balance between cost and need at a time when the improvement would be useful. When once found to be navigable, a waterway remains so."

We feel free to adopt this test, notwithstanding the definition of navigability contained in subdivision 5 of section 2 of the Navigation Law, since that definition only governs the use of the term in that law and does not purport to define the limit of the State's powers in controversies not arising under that law. In view of the fact that the Federal and State Governments exercise dual control over many navigable waters, it is important that the same test should be applied in determining navigability for Federal and State purposes.

Under the *Appalachian* test, the first part of the Ticonderoga River was clearly a navigable extension of Lake George in its " natural and ordinary condition ", if all that was required to allow a continuous passage was the slight improvement of a channel of the Natural Dam by a deepening of twenty-seven inches by the removal of a small quantity of rock. This exten-

sion considerably shortened the length of the portage around the middle section of the river occupied by the water falls, to reach the lower part of the river and Lake Champlain.

To the extent to which the Ticonderoga River was capable of being used as a waterway connecting Lake George and Lake Champlain, it was an important link in what was once one of the most important water highways of the country. Upon the evidence, we find that all but the middle part of the river was available for use in this way. The interruption of navigability by the water falls in the middle part of the river did not have any effect upon the legal character of the stream. "Whether the Niagara river is navigable at the particular point of the defendant's intake for water used to create power is immaterial. The Niagara river being navigable in part is thus navigable in whole, so far as the control of the river for purposes of commerce and navigation is concerned" (*Niagara Falls Power Co.* v. *Water Power and Control Comm.*, 267 N. Y. 265, 270).

We therefore conclude that the Ticonderoga River as a whole should be treated as a navigable stream.

It would seem logically to follow from the conclusion that the Ticonderoga River is navigable that the State is the owner of the bed of the river in its sovereign capacity, the capacity in which it owns the bed of Lake George. (Cf. *Matter of City of Syracuse* v. *Gibbs*, 283 N. Y. 275, *supra*.) However, the law of New York State seems to be settled that, with the exception of boundary rivers and the Hudson and Mohawk Rivers, the bed of fresh water navigable streams is the subject of private property and may be owned either by riparian owners or by the State in its proprietary capacity (*Fulton L., H. & P. Co.* v. *State of New York*, 200 N. Y. 400; *Waterford Electric L., H. & P. Co.* v. *State of New York*, 208 App. Div. 273, affd. 239 N. Y. 629). This rule probably stems from the view which was once erroneously held in this State that streams which are navigable in fact are nevertheless not navigable in law, if they are not tidal. That view has long since been rejected and it is now the settled law that a stream which is navigable in fact is navigable in law, even though it is nontidal (*Waterford Electric L., H. & P. Co.* v. *State of New York*, *supra*). But the tidal test of navigability, even though discredited, has left its imprint upon the law governing the ownership of the bed of navigable fresh water streams. Vestigial as the rule may be, it is a settled rule of property law and we must respect it as such. Under this rule, we find that the conveyances upon which the defendant

System relies were adequate to convey the bed of the Ticonderoga River at and about the site of the dam to System and its predecessors. We therefore conclude that the title to the dam site is in the defendant System. This title is, of course, subject to the reserve power of the State to regulate the Ticonderoga River as a navigable river and it is also subject to the additional rights of the State, growing out of the fact that the river is the outlet of Lake George and that obstructions in it may affect the level of Lake George.

There remains for consideration the demand of the plaintiffs-interveners for a judgment directing the removal of the dam. The plaintiffs-interveners cannot enforce the State's reserve power; they may enforce only their own rights as riparian owners. Those rights have been effectively barred by prescription. The present dam has been in existence for almost fifty years and the raising of the water level of Lake George as the result of the presence of the dam has continued throughout that period. To the extent to which the raising of the water level affected the riparian owners, a prescriptive right has been acquired by the defendant System against them.

A belated application has been made by the individual plaintiffs in an effort to give them standing to maintain this action as one to restrain a violation of article XIV of the New York State Constitution, setting apart the forest preserve. The power to enforce the State's rights with respect to the forest preserve is vested by the Constitution, in the first instance, in the Attorney-General. The Constitution gives a secondary right to any citizen of the State to maintain an action to restrain a violation, if the Attorney-General defaults, provided that the Appellate Division consents to the maintenance of such action. The constitutional provision plainly contemplates the granting of consent in advance of the commencement of an action; it does not authorize retroactive approval long after the trial of the action and the entry of judgment therein. The individual plaintiffs' motion for the consent of this court under article XIV of the Constitution is therefore denied.

The judgment appealed from should be reversed on the law and the facts, without costs. Findings of fact and conclusions of law may be settled on notice, and judgment may be entered accordingly.

FOSTER, P. J., BERGAN, COON and IMRIE, JJ., concur.

Judgment reversed, on the law and facts, without costs. Findings of fact and conclusions of law to be settled on notice.