## NIAGARA MOHAWK POWER CORP. v. FEDERAL POWER COMMISSION.
### No. 10862.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 26, 1951.

Decided Dec. 31, 1952.
Writ of Certiorari Granted May 18, 1953.
See 73 S.Ct. 939.

192

John W. Davis, New York City, with whom Randall J. LeBoeuf, Jr., and Chauncey P. Williams, Jr., New York City, were on the brief, for petitioner. Craigh Leonard, New York City, also entered an appearance on behalf of petitioner.

Willard W. Gatchell, Assistant General Counsel, Federal Power Commission, Washington, D. C., with whom Bradford Ross, General Counsel, Federal Power Commission, Washington, D. C., was on the brief, for respondent.

Before KIMBROUGH STONE, Circuit Judge, retired (sitting by designation), and WILBUR K. MILLER and BAZELON, Circuit Judges.

PER CURIAM.

The question on this review is whether the Federal Power Commission correctly determined the amortization reserve liability, under § 10(d) of the Federal Power Act, 16 U.S.C.A. § 803(d), of a water power licensee.

Long prior to the enactment of the Federal Water Power Act of 1920, 41 Stat. 1063,[1] the Niagara Falls Power Company

1. This Act is now Part I of the Federal Power Act, 16 U.S.C.A. § 791 et seq.

was the owner of plants on the Niagara River which utilized water from that stream in generating electric energy. It had certain water rights which will be more fully described hereinafter. After the passage of the Act of 1920, the Power Company applied to the Federal Power Commission for a license under the new statute to cover the operation of its existing plants and others then under construction. Such a license, which designated the plants as Project No. 16, was issued by the Commission on March 2, 1921.

Section 10(d) of the Act conditions such licenses by providing

"That after the first twenty years of operation, out of surplus earned thereafter, if any, accumulated in excess of a specified reasonable rate of return upon the net investment * * * the licensee shall establish and maintain amortization reserves * * *."

The reserve so established must either be held until the termination of the license or be applied from time to time to reduce the net investment, as the Commission may direct. The license for Project No. 16 specifies a six per cent return, and provides that one-half of any surplus earnings in excess thereof shall be paid into and held in an amortization reserve.[2]

Acting pursuant to § 10(d), the Federal Power Commission, on March 15, 1949, ordered the Niagara Falls Power Company to show cause within thirty days "why the Commission should not find, determine and direct that" surplus earnings of Project No. 16 in the sum of $994,521.33 for the period from March 2, 1941, to December 31, 1946, (the initial period) be set aside in an amortization reserve, and that the method used by the Commission in computing surplus earnings for that initial period be employed in determining surplus earnings for succeeding years. The Company resisted, claiming the reserve should be only $515,432.04.

After hearings, the Commission made a slight reduction in the amount of surplus earnings suggested in the show cause order,

and on September 27, 1950, entered an order directing, among other things, that Niagara Falls Power Company place in an amortization reserve the sum of $914,432.04 as one-half of surplus earnings from March 2, 1941, to December 31, 1946.

In fixing that figure the Commission increased the Power Company's computation of its amortization reserve liability by $399,000. This was the result of two findings and conclusions: (a) the Commission disallowed as operating expense the Power Company's annual payment of $99,000 to International Paper Company for the right to use 730 cubic feet per second (cfs) of water for power development,—a water right which had been conveyed to the Power Company by the Paper Company by defeasible grant which reserved that yearly payment. The total disallowance for the initial period on this score was $577,500. (b) The Commission artificially increased the Power Company's revenue for the initial period by $220,500, by disallowing a rate concession amounting to that sum which had been given by the Power Company to its parent, Buffalo Niagara Electric Corporation, as the consideration for the right to use 262.6 cfs of water for power development—the "Pettebone-Cataract" water rights—which it had acquired from Buffalo Niagara by contract.

These two adjustments increased the Power Company's surplus earnings for the initial period by $798,000. One-half of that sum—$399,000—is the amount by which the Commission's order increased the required amortization reserve. The Commission's order which disallowed the rate concession to Buffalo Niagara and the payments to International Paper during the initial period also required that they be disregarded in computing amortization reserve liability during the remainder of the license period.

On October 19, 1950, Niagara Mohawk Power Corporation became, through a merger, the owner of all the assets of Niagara Falls Power Company and succeeded it as licensee of Project No. 16, so becoming subject to the Commission's or-

2. If the United States should take over Project No. 16 at the end of the license period, pursuant to § 14 of the Act, such amortization reserve may be deducted from original cost in determining the amount to be paid the licensee.

der of September 27, 1950, which we have just described. In a petition for review, the successor licensee asks us to modify the Commission's order by holding that Buffalo Niagara and International Paper have valid water rights for the use of which it is obligated by contract to give the considerations which the Commission has disallowed; and asks us to reduce accordingly the required amortization reserve, both for the initial period and the remainder of the license term. There is no dispute about the facts. Niagara Mohawk's remote predecessors in hydraulic power development at Niagara Falls constructed a canal, which was completed in 1861, tapping the Niagara River nearly a mile above the Falls and conveying water to a canal basin on the High Bank of the river approximately one-half mile below the Falls. The proprietors of the canal conveyed various mill sites to others with rights to use water for generating power. This water was drawn not from the river but from the canal basin. The general method of power development at that time was to sink shafts or pits at the edge of the cliff under the mills, and to use water from the canal to drive turbines at the bottom of the pits. After such use the water escaped through tunnels to the face of the High Bank and thence back into the river.

The petitioner's later predecessors, as a part of the program of developing and disposing of electric energy, continued the policy of purchasing various tracts of land in the vicinity of their power facilities to be sold or leased to industrial power customers, sometimes with the right to use water to develop power. Out of this practice arose the two water rights involved in this proceeding. A description of the principal branches of the "family tree" of Niagara Mohawk Power Corporation will aid in understanding the origin and history of these rights.

1. Niagara Falls Hydraulic Power and Manufacturing Company, organized in 1876, was succeeded in 1910 by Hydraulic Power Company of Niagara Falls.

2. The original Niagara Falls Power Company was organized in 1886.

3. Cliff Electrical Distributing Company was organized in 1909.

4. On October 31, 1918, Hydraulic Power, the original Niagara Falls Power Company, and Cliff were consolidated into a single corporation called Niagara Falls Power Company.

5. Through merger, the consolidated Niagara Falls Power Company was succeeded by Niagara Mohawk on October 19, 1950.

*The International Paper Company issue.*

The Niagara Falls Power Company leased to the Soo Paper Company in 1891 a tract of land on the bank of the Niagara River immediately downstream from its power house and adjacent to its intake canal. The lease gave the Paper Company the right to take and use water, either from the Niagara River at a point opposite the leased parcel or from the intake canal of the Power Company, in an amount sufficient to develop 3,000 horsepower, and gave the lessee the right to discharge such water through the tunnel of the Power Company, which returned it to the river below the Falls.

On March 7, 1896, the Power Company conveyed the premises so leased, consisting of approximately 11.75 acres of land and land under water, and the right to take, use and discharge water, to Niagara Falls Paper Company, successor to the Soo Paper Company. The conveyance of the premises was subject to an annual rental of $24,000 for the right to take and use water sufficient to produce 3,000 horsepower, which was held to be 300 cfs "when the fall available on said property shall be 120 feet." Later in the year 1896, by agreement of the parties, the Paper Company increased its taking of water to an amount sufficient to develop 7,200 horsepower. In 1898 the Niagara Falls Paper Company conveyed the land and water rights so acquired by it to International Paper Company. The Power Company consented to the conveyance, and confirmed to International Paper all the grants and rights which were being transferred to it. International Paper continued the diversion and utilization of water under that grant and, in the winter of 1917–18, was taking from the Power Company's intake canal, and using, approximately 730 cfs.

Under the Burton Act of 1906, 34 Stat. 626, and subsequent Congressional joint resolutions, the Secretary of War authorized the Power Company to divert from the Niagara River 8,600 cfs, which included the 730 cfs taken by International Paper Company from the Power Company's intake canal. In 1917–18 the Secretary permitted the Power Company's diversions of water to be increased to 10,000 cfs. But in December, 1917, the Secretary of War requisitioned the entire power output of the plants at Niagara Falls and required the Power Company to utilize through its own facilities the 730 cfs of water theretofore diverted by the International Paper Company. As a result the latter was deprived of the right to take that water for a period of more than nine months in the year 1918. This incident gave rise to litigation, to which further reference will be made hereinafter.

The right of International Paper to 730 cfs of water was acquired by the new Niagara Falls Power Company in 1919. The transfer came about in this way: by a contract of March 1, 1919, the Power Company agreed to furnish to International Paper a specified amount of electric energy, and International Paper granted and released to the Power Company all its rights to take from the Niagara River or the intake canal water for use in the development of power. But the grant was conditioned upon the continuance of the supply of the specified amount of electric energy by the Power Company. If that should fail for a period of 90 days, International Paper had the option to revive its right to take and use 730 cfs of water. International Paper agreed to pay for electric energy furnished by the Power Company at the rate of $20 per electrical horsepower per annum, but it was agreed that International Paper should be credited for the water rights granted, released and surrendered with a sum sufficient to reduce the charges against it to $76,000 per annum.

In 1937 the Power Company filed with the New York Public Service Commission a rate schedule for sales of electric power to industrial customers, after which the Power Company and International Paper made a new agreement which amended the 1919 contract in order to conform to the new rate schedule. Thereafter International Paper paid for electric energy at the rates prescribed by the tariffs in effect from time to time; but, in order to compute the "fair and reasonable annual use or rental value" of the 730 cfs of water which had been conditionally released by International Paper, the 1937 agreement contained a formula which produced as the rental value of the 730 cfs of water $82,500 for the period from March 1 to December 31, 1941, and $99,000 for each of the years from 1942 to 1946, both inclusive. These are the sums, actually paid by the licensee for the International Paper rights, which have been disallowed by the Federal Power Commission as operating expense deductions in the amortization reserve computation.

### The Buffalo Niagara (Pettebone-Cataract) issue.

Certain mill sites and appurtenant water rights were acquired by the Pettebone-Cataract Paper Company and the Cataract City Milling Company, which are referred to in the record as the Pettebone-Cataract companies. Some sixty years ago those companies and Niagara Falls Hydraulic Power and Manufacturing Company, which was then proprietor of the hydraulic canal, were in dispute as to the nature and extent of the water rights. They settled their differences by means of a contract dated January 1, 1900, which fixed the amount of water to which the Pettebone-Cataract companies were entitled at 262.6 cfs at a head of 100 feet. This was only a partial head, as the basin was about 215 feet above the river level below the Falls; so the proprietor reserved the right to enter on the Pettebone-Cataract lands and to construct a tunnel under the High Bank to collect the water discharged by those companies and utilize it through the remaining 115 feet of fall.

It was not until 1914, however, that Hydraulic Power Company, which in the meantime had become proprietor of the canal, proposed to construct the tunnel contemplated by the 1900 agreement and thereby to utilize, through the remaining head of 115 feet, the water diverted by the Pettebone-Cataract companies. Those companies refused to permit such construction, as a

result of which the Niagara Falls Power Company, which by then had succeeded Hydraulic Power Company, sued to enjoin them from interfering. The New York courts upheld the right of the Power Company to construct upon the Pettebone-Cataract lands facilities necessary to utilize the remaining head and awarded damages of approximately $172,000 against the Pettebone-Cataract companies for their breach of the 1900 contract. Hydraulic Power Company v. Pettebone-Cataract Paper Company, 1920, 112 Misc. 528, 183 N.Y.S. 373, affirmed, 1921, 191 N.Y.S. 12, 198 App.Div. 644.

While the litigation just described was in progress, the Federal Water Power Act was enacted on June 10, 1920. The Power Company applied for a license thereunder and set forth the construction necessary to utilize the outfall of the turbines of the Pettebone-Cataract companies through the remaining head of 115 feet. During the pendency of the appeal in the litigation between the Power Company and the Pettebone-Cataract companies, the Federal Power Commission issued to the former the Project No. 16 license which is here involved. The license contains the following:

"13. In the event that the United States or a new licensee shall take over the project of the licensee pursuant to the provisions of the Act,

* * * * *

"Such taking over of the project shall also be subject to the rights, if any, of Pettebone-Cataract Paper Company and Cataract City Milling Company to withdraw water at a rate not exceeding 265 cubic feet per second from the Hydraulic canal or basin of licensee, and to the rights, if any, of International Paper Company."

The hydraulic structures which the Power Company proposed in its license application were constructed, and from September 6, 1922, until June 21, 1925, the Power Company actually used the 262.6 cfs of water under the head which remained available after utilization by the Pettebone-Cataract companies.

In 1925 the properties of Pettebone-Cataract companies, including lands, buildings, machinery and water rights, were sold to Niagara Lockport and Ontario Power Company. As a part of the consideration therefor, Niagara Lockport assumed the judgment debt owed to Niagara Falls Power Company by the Pettebone-Cataract companies. Thereafter Niagara Lockport conveyed to Niagara Falls Power Company the lands, buildings, plant and machinery (but not the water rights) in satisfaction of the judgment debt which it had assumed. The Power Company accepted the conveyance as extinguishing the debt. Simultaneously it leased the water rights from Niagara Lockport and, as the consideration therefor, agreed to furnish Niagara Lockport a stated amount of electric energy, for which the latter was to pay a charge initially fixed at $6.70 per kilowatt per annum, this being substantially lower than the rate for electric energy which then prevailed at Niagara Falls.

These transactions were consummated by writings dated May 21, 1925, and thereafter for twenty years Niagara Falls Power Company utilized the 262.6 cfs of water, covered originally by the Pettebone-Cataract rights, for the generation of hydraulic electric power under a head of 215 feet.

Niagara Lockport was succeeded in 1945 by Buffalo Niagara Electric Corporation, which thereupon became entitled to the former's rights under the deed and agreement of May 21, 1925. Buffalo Niagara also became the owner of all the capital stock of Niagara Falls Power Company. It was then proposed that Buffalo Niagara sell to the Power Company its rights in the 262.6 cfs for $728,415.48, the cost to Niagara Lockport when it acquired the water rights from the Pettebone-Cataract companies. The New York Public Service Commission approved and authorized the transfer on February 5, 1947. After such approval the companies filed a declaration with the Securities and Exchange Commission, under § 12(d) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79l(d), for consent to or approval of the transaction as a sale of utility assets; and on February 28, 1947, that Commission entered an order permitting the declaration to become effective.

The Power Company requested the Federal Power Commission to agree to the amendment of paragraph 13 of Project No. 16 license, quoted above, so as to record the effect of its acquisition of the Pettebone-Cataract water rights from Buffalo Niagara, by eliminating therefrom the reference to "rights, if any, of Pettebone-Cataract Paper Company and Cataract City Milling Company to withdraw water at a rate not exceeding 265 cubic feet per second from the Hydraulic canal or basin of licensee, * * *." The Power Commission, in an order accompanied by its Opinion No. 159, denied the proposal for amendment on November 17, 1947, saying,

"In our opinion Buffalo Niagara Electric Corporation does not possess any lawful title to the water rights in question for the reason that there cannot be private ownership of the waters of a navigable river of the United States. United States v. Chandler-Dunbar, 229 U.S. 53, 66, [33 S.Ct. 667, 57 L.Ed. 1063] * * *. The licensee already has the right, under the license, to use the 262.6 c.f.s. which is the subject of its petition, and it is futile for it to attempt to purchase that which it already possesses to the fullest extent of the law."

Thereafter the Niagara Falls Power Company advised the Power Commission that

"* * * while it does not agree with the reasoning or conclusions contained in Opinion No. 159, no application for rehearing will be made from the order denying the application for amendment of license * * *.

"It is the Company's position that its failure to apply for a rehearing or to renew the application is without prejudice to its right to contest the legal conclusions contained in Opinion No. 159, should the matter arise in concrete form in any subsequent proceeding."

The Commission's letter in response stated its opinion that, by electing not to seek a rehearing and court review, the Niagara Falls Power Company had "waived any further question that it may have had concerning the legal conclusions contained in Opinion No. 159."

The legal conclusion in its Opinion No. 159, quoted above, is the basis of the Federal Power Commission's reliance upon the doctrine of *res judicata* in the present case, thus stated in its brief:

"In its decision and order of November 21, 1947 the Commission found, among other things, that Licensee was authorized by its Federal Power Act license to use the water in question for power development through Project No. 16 and that Buffalo Niagara Electric Corporation had no such authority and had no water power rights to sell.

"In its decision and order issued September 27, 1950 (A. 105), which is here under review, the Commission rejected the proposed inclusion in the project accounts: (1) of rental payments of $37,800 annually to Buffalo Niagara Electric Corporation for the use of water covered by the so-called Pettebone-Cataract water right claim; and (2) annual rental payments of $99,000 to International Paper Company for use of water rights claimed by the latter company for power development. Consequently, the question in the Commission's order of September 27, 1950 concerning the water right claims was in substance the same as that decided by the Commission on November 21, 1947 (A. 108–110), and the Commission's first decision was determinative of that question. Landreth v. Wabash R. Co. (C.A.7, 1946) 153 F. 2d 98, 99–100; Mulcahy v. Public Service Commission (Utah, 1941) 117 P.2d 298, 302–304."

 Whether its order of November 21, 1947, was reviewable under § 313 of the Federal Power Act may well be doubted, since it amounted to nothing more than a refusal to agree to the licensee's proposal

that the license be amended.[3] To agree or not was purely within the discretion of the Commission, and its refusal to do so could not have been reviewed except perhaps on the ground that it was an arbitrary abuse of discretion. The mere fact, therefore, that the Commission recited a legal conclusion as its reason for refusal did not necessarily make the order itself subject to judicial scrutiny. But, whether so or not, we do not think the Commission can preserve from judicial examination a possibly erroneous legal ruling by embalming it in *res judicata*. This court, speaking through Chief Justice Groner in Churchill Tabernacle v. Federal Communications Commission, 1947, 81 U.S.App.D.C. 411, 160 F.2d 244, 246, described as well settled the doctrine that "*res judicata* and equitable estoppel do not ordinarily apply to decisions of administrative tribunals."

We are of the opinion that the Commission's plea of *res judicata* must be rejected and that the main issues are open to examination. Those issues are: (a) the validity *vel non* of the International Paper and Pettebone-Cataract water rights under the law of New York; and (b) how those rights were affected by the Federal Water Power Act of 1920.

### I

■ We have noted that, in its Opinion No. 159, issued in 1947, the Federal Power Commission said,

"In our opinion Buffalo Niagara Electric Corporation does not possess any lawful title to the water rights in question for the reason that there cannot be private ownership of the waters of a navigable river of the United States."

This continues to be the Commission's basic contention with respect to the Pettebone-Cataract (Buffalo Niagara) water rights, and the International Paper rights as well. We observe, however, that the water rights in question do not rest upon a claim of ownership of the running waters of the Niagara. It is a usufructuary property right in the waters which is asserted—a vastly different thing, which was recognized at common law and has been confirmed by judicial decisions.

The distinction between absolute ownership of flowing waters and the right to use them temporarily was aptly stated in Sweet v. City of Syracuse, 1891, 129 N.Y. 316, 335, 27 N.E. 1081, 1084:

"* * * It is a principle, recognized in the jurisprudence of every civilized people from the earliest times, that no absolute property can be acquired in flowing water. Like air, light, or the heat of the sun, it has none of the attributes commonly ascribed to property, and is not the subject of exclusive dominion or control. As Blackstone observes, (2 Bl.Comm..18:) 'Water is a movable, wandering thing, and must of necessity continue common by the law of nature; so that I can have only a temporary, transient, usufructuary property therein.' While the right of its use, as it flows along in a body, may become a property right, yet the water itself, the *corpus* of the stream, never becomes, or, in the nature of things, can become, the subject of fixed appropriation or exclusive dominion, in the sense that property in the water itself can be acquired or become the subject of transmission from one to another. Neither sovereign nor subject can acquire anything more than a mere usufructuary right therein, * * *."

■ So, although neither Buffalo Niagara, nor International Paper, nor Niagara Mohawk has any title to the water flowing in the Niagara, the question is whether they have "a temporary, transient, usufructuary property therein." That depends upon the law of New York because, as the Supreme Court said in United States v. Chandler-Dunbar Company, 1913, 229 U.S. 53, 60, 33 S.Ct. 667, 671, 57 L.Ed. 1063:

3. A license issued under Part I of the Federal Power Act may not be altered except by agreement between the Federal Power Commission and the licensee.

(§ 6 of the Act.) The Commission has no power, acting alone, to amend or in any way change an outstanding license.

"The technical title to the beds of the navigable rivers of the United States is either in the States in which the rivers are situated, or in the owners of the land bordering upon such rivers. Whether in one or the other is a question of local law."

■■ Under the law of New York a riparian owner's right to use the waters of a stream for power purposes is a part of his estate, United Paper Board Company v. Iroquois Pulp & P. Company, 1919, 226 N.Y. 38, 123 N.E. 200; Waterford Electric Light, Heat and Power Company v. State of New York, 1924, 208 App. Div. 273, 203 N.Y.S. 858, affirmed 239 N.Y. 629, 147 N.E. 225, and is a corporeal hereditament, Van Etten v. City of New York, 1919, 226 N.Y. 483, 124 N.E. 201.

This usufructuary right is an incident to riparian ownership and does not depend upon grant or prescription. It is subject to the paramount right of the State to utilize the waters for a public purpose without paying compensation therefor; but, until the State exercises its paramount right, the riparian owner's usufructuary right is unimpaired. These principles were stated by the New York courts in People ex rel. Niagara Falls Hydraulic Power and Manufacturing Company v. Smith, 1902, 70 App.Div. 543, 75 N.Y.S. 1100, 1101, affirmed without opinion 1903, 175 N.Y. 469, 67 N.E. 1088, with express reference to the water rights from which those in question here derive. The court said that Niagara Falls Hydraulic Power, one of Niagara Mohawk's predecessors,

"* * * as a riparian owner and as owner of the lands under the waters of the Niagara river adjacent to its uplands from which the water is immediately taken, has the right to the *use* of the waters of the river for manufacturing purposes, and to divert the same for that purpose, returning them to the river, as it does, after passing over its own lands [citations], subject only to the paramount right of the state to utilize these waters for a public use, without compensation to such riparian owners; all riparian rights remaining unimpaired until the exercise of such paramount right by the state. This being so, it appears that the relator, as riparian owner, had the right to take waters from the Niagara river for manufacturing purposes, not interfering thereby with the navigability of the stream; such right being in no sense in the nature of a franchise, but a corporeal hereditament, not depending either upon grant or prescription." (Emphasis supplied.)

Since the usufructuary property right of Niagara Falls Hydraulic and its successors was and is subject to the superior right of the State of New York, in order to see whether the right still exists it is necessary to ascertain whether the State has exercised its paramount authority and, if so, to what extent.

■ Activity of the State began with an Act of 1886, c. 83, which authorized diversion for manufacturing purposes, limited only to non-interference with navigation. The first limitation as to quantity was imposed by Chapter 513 of the laws of 1892, which gave the Niagara Falls Power Company the right to take and use the waters of the Niagara River to the extent required for the proper operation of its authorized facilities, provided that nothing contained in the act should be construed to confer any right to obstruct the navigation of the Niagara River, or to take therefrom more water than sufficient to produce 200,000 effective horsepower. Chapter 968 of the Laws of 1896 authorized the Niagara Falls Hydraulic Power & Manufacturing Company to use the waters of the Niagara River to develop power and to sell it to others, limiting the use to such quantity of water as might be drawn by means of the company's hydraulic canal when enlarged throughout its entire length to a width of 100 feet and to a depth and slope sufficient to carry at all times a maximum uniform depth of 14 feet of water, provided the exercise of the rights should not impair the practical navigation of Niagara River.

Chapters 596 and 597 of the Laws of 1918 further regulated the use of the waters of the Niagara; they permitted the Cliff Electrical Distributing Company, the

Niagara Falls Power Company, and Hydraulic Power Company of Niagara Falls to consolidate, and permitted the new corporation to divert the water of the Niagara River for the development of power, with this proviso:

"Provided further that if the corporation constituted by such consolidation shall divert from the Niagara river for power purposes more than fifteen thousand one hundred cubic feet per second there shall be reserved to the state the right to charge an equitable rental therefor in such amount and in such manner as shall hereafter be provided by law; and provided further that nothing in this act shall be construed as giving the right to discharge water into the Niagara river at a point more than one thousand feet below the lowest point of discharge into such river by any of the corporations so consolidated as now fixed. Nothing in this act shall be construed to waive or alienate any right now vested in the state as to waters now being diverted by any of such corporations so consolidated, or to compensation for said rights."

An amendment in 1943 to the State Conservation Law, McKinney's Consol.Laws, c. 65, §§ 612, 614, 634, 639, Chapter 46 of the Laws of 1943, required a rental to be paid for the use of the initial 15,100 cfs which the 1918 act had permitted to be rent free.

From the various legislative enactments to which we have referred, it is seen that New York has exercised its sovereign paramount authority to regulate the use of Niagara waters by restricting the original riparian rights upon which the Pettebone-Cataract and International Paper rights depend. It has limited the quantity of water which may be used, and has exacted a rental charge for its use. But the legislature has not destroyed the riparian rights, as it might have done by pre-empting the entire available flow; rather it has confirmed the rights as limited and defined in the several statutes.

This view is reflected in judicial opinions. In Hydraulic Power Company of Niagara Falls v. Pettebone-Cataract Paper Company, 1921, 198 App.Div. 644, 191 N.Y.S. 12, 13, the court described the Pettebone-Cataract water rights by saying:

"The [Pettebone-Cataract companies], by mesne conveyances (the details of which are not of controlling significance), are respectively the owners of certain water rights, by virtue of which they take, and have for years taken, quantities of water from such basin and conducted the same to turbines, upon their properties, and thereby generated electrical power for their own private uses."

Thus in 1921, with all the New York statutes through 1918 before it, the court found the Pettebone-Cataract water rights still existent.

The validity of the International Paper water rights under State law was recognized by the Supreme Court in International Paper Company v. United States, 1931, 282 U.S. 399, 404, 51 S.Ct. 176, 75 L.Ed. 410. This was a proceeding brought by International Paper in the Court of Claims to recover compensation for the right to use 730 cfs of water from the Niagara River, which was temporarily taken by the United States for war purposes, as we have described above. The Court of Claims denied recovery, but the Supreme Court reversed and, in the course of its opinion, described the International Paper water rights as follows:

"* * * The Niagara Falls Power Company by private grant to it, Letters Patent from the State of New York and acts of the Legislature of that State, was the owner * * * of land and water rights on the American side of the River above the Falls. Included in them was a power canal through which the Power Company was authorized to divert 10,000 cubic feet per second, at the time of the alleged taking. From this canal the petitioner, the International Paper Company, was entitled, by conveyance and lease, to draw and was drawing 730 cubic feet per second,—a right that by the law of New York was a

corporeal hereditament and real estate."

It is significant that the quoted language was written by the Supreme Court long after the Federal Water Power Act became law, and when all New York statutes through 1918 were in effect.

The Federal Power Commission argues, however, that the 1943 amendment to the State Conservation Law, which required rental for the use of the first 15,100 cfs diverted by Niagara Falls Power Company (theretofore free of rent), destroyed the private rights in issue here. It cites in support of the argument Niagara Falls Power Company v. Duryea, 1945, 185 Misc. 696, 57 N.Y.S.2d 777. The case is inapposite, for the court simply sustained the further imposition of water rentals. That holding was not destruction, but confirmation, of the private rights.

In summing up its argument that the water rights asserted here do not exist under the law of New York and should not be recognized by this court, the Power Commission assigns three reasons for its position: (a) "there can be no perpetual right to use the water of a navigable river"; (b) "any permission given by the State may be withdrawn at any time when the State so decides, without compensation for the loss of the privilege"; and (c) "It has not been shown that either Buffalo Niagara or International Paper Co. held authority from the State Water Power and Control Commission to use the water from March 1 [sic], 1941, to December 31, 1946." None of these reasons supports the Commission's conclusion.

As to reason (a) quoted above, we have shown that riparian water rights are property rights subject only to the reserve power of the state and national governments to restrict or destroy them. Reason (b) quoted above, while an accurate statement of principle, does not justify the conclusion that the water rights do not exist. The question is, not what the state may do, but what it has done; for we have seen that riparian rights continue unimpaired until the state asserts its superior authority. It must also be true that, when the state takes regulatory action which limits, but does not destroy, the private water rights, those rights continue to exist subject to the limitations imposed. Reason (c) quoted above apparently assumes that the water rights which are claimed did not exist during the initial period from March 2, 1941, to December 31, 1946, unless it could be shown—as it was not—that Buffalo Niagara and International Paper had been licensed during that period by the State Water Power and Control Commission to use the quantities of water covered by their rights.

In considering the validity of the Commission's reason (c), we must ascertain whether a license from the Water Power and Control Commission was a statutory prerequisite to the exercise of the rights during the initial period. The answer is found in a New York decision and in the 1943 amendment to the New York Conservation Law.

The New York Water Power and Control Commission instituted an action in 1937 to enjoin Niagara Falls Power Company from diverting the basic 15,100 cfs on the ground that it had not obtained a license to do so, as the Commission thought the Conservation Law required. That law then declared diversion of water from the Niagara for power, or other commercial purposes to be unlawful except under a license from the Water Power and Control Commission or by virtue of a "right lawfully and previously acquired".

The Appellate Division dismissed the action, referring to the cases which hold that a riparian owner's right to divert and use water from a navigable stream is a property right, and referring also to the New York statutes confirming the water rights of Niagara Falls Power Company. It was held that those rights, although subject to the reserve powers of the State, exempted Niagara Falls Power Company from the licensing provision of the Conservation Law as to the basic 15,100 cfs because the Power Company's right to use that initial quantity had been "lawfully and previously acquired". Water Power and Control Commission v. Niagara Falls Power Company, 1941, 262 App.Div. 460,

202

30 N.Y.S.2d 371, 374, affirmed 1942, 289 N.Y. 353, 45 N.E.2d 907. It follows that a State license was not required under the Conservation Law as it then existed.

In 1943 the Conservation Law was amended. The exception accorded to a "right lawfully and previously acquired" was eliminated, and any diversion from the Niagara for power or other commercial purposes was made "subject to the charging or imposition of an equitable rental * * *." It was provided that, after July 1, 1943, an equitable rental would be charged on the diversion of the basic 15,100 cfs. After that date, therefore, the exercise of all the petitioner's water rights was subject to the payment of rental to the State and the exemption from the licensing requirement as a "right lawfully and previously acquired" no longer existed. It should be noted, however, that by a provision of the 1943 amendment, a State license is not required for the diversion of waters for which a rental is exacted. Thus at no time during the period from March 2, 1941, to December 31, 1946, was it necessary that a license be obtained from the State Commission prior to exercising these water rights.

We hold that the International Paper and Pettebone-Cataract water rights are valid under the law of New York. How they have been affected by the Federal Water Power Act of 1920 remains for consideration.

II

In the foregoing section of this opinion, we examined the question whether the petitioner's usufructuary property right in the waters of the Niagara has been destroyed or impaired by the State of New York in the exercise of its paramount authority. We concluded that the water rights in question have been limited and regulated by the State but still exist to the extent claimed, which is well within the limitation imposed. Since the petitioner's usufructuary right was and is also subject to the superior right of the national government, in order to see whether the property right still exists it is necessary to ascertain whether Congress has exercised

its paramount authority and, if so, to what extent.

So we turn to the question whether the Federal Water Power Act, which became law on June 10, 1920, destroyed the International Paper and Pettebone-Cataract water rights theretofore and now valid as far as the law of New York is concerned. The Federal Power Commission argues that it did; that thereafter the right of Niagara Falls Power Company to use Niagara waters for power purposes derived from the license granted to it in 1921 under the federal statute, and from no other source.

In support of this proposition the Power Commission cites United States v. Chandler-Dunbar Company, 1913, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063. A review of the factual situation and the statute involved in that case will show it is not authority for the respondent Commission's position.

Prior to 1909 the Chandler-Dunbar Company owned uplands on the American shore of the St. Marys River and so had technical title, under the law of Michigan, to the abutting bed of the river from the bank to the middle thread of the stream. It had installations for the development of power and used the river's waters for that purpose, under its rights as a riparian owner and pursuant to a revocable permit from the Secretary of War. By an Act of March 3, 1909, 35 Stat. 815, Congress declared (at page 820)

"* * * That the ownership in fee simple absolute by the United States of all lands and property of every kind and description north of the present Saint Marys Falls Ship Canal throughout its entire length and lying between said ship canal and the international boundary line at Sault Sainte Marie, in the State of Michigan, is necessary for the purposes of navigation of said waters and the waters connected therewith."

The Secretary of War was directed immediately to acquire by condemnation or otherwise all the lands and property which the Act described as necessary for the

purposes of navigation. It was further provided that

"Every permit, license, or authority of every kind, nature, and description heretofore issued or granted by the United States, or any official thereof, to the Chandler-Dunbar Water Power Company, * * * shall cease and determine and become null and void on January first, nineteen hundred and eleven * * *.",

All Chandler-Dunbar power installations were accordingly condemned, and a substantial allowance was made for its water rights in the St. Marys. On appeal, the Supreme Court noted the principal question to be

" * * * whether the Chandler-Dunbar Company has any private property in the water power capacity of the rapids and falls of the St. Marys River which has been 'taken,' and for which compensation must be made under the Fifth Amendment to the Constitution * * *." [229 U.S. 53, 33 S.Ct. 671.]

The opinion pointed out that the

" * * * title of the owner of fast land upon the shore of a navigable river to the bed of the river, is at best a qualified one. It is a title which inheres in the ownership of the shore and, unless reserved or excluded by implication, passed with it as a shadow follows a substance, although capable of distinct ownership. It is subordinate to the public right of navigation, and * * * is of no avail against the exercise of the great and absolute power of Congress over the improvement of navigable rivers."

The Court said Congress had determined in the 1909 statute that the whole flow of the stream should be devoted exclusively to the purposes of navigation. So unfettered is the control of Congress over navigable streams, said the Court, that its determination of the necessity of utilizing the entire flow for navigation is conclusive. There is no room, it was said, for a judicial review of the judgment of Congress that the flow of the river is not in excess of any possible need of navigation.

While the Chandler-Dunbar riparian water rights, acquired under the law of Michigan, were valuable property rights, they were *ab initio* subordinate and inferior to the paramount power of the United States to take all the river's flow for the purposes of commerce. When Congress exercised that power, it extinguished the Chandler-Dunbar rights, because after that taking there remained no portion of the flow with respect to which those previously existing rights could be effective. So the Court held the riparian owner had to yield without compensation its rights which had always been inferior.

Since the Chandler-Dunbar ruling was that the statute of 1909 seized all the flow of the St. Marys and that the inferior rights thereby extinguished were not compensable, the case is not authority for the Power Commission's position. It simply demonstrates the obvious proposition that, when the government takes control of all the waters of a navigable stream, there is no room thereafter for previously existing private usufructuary rights. But it is equally true that the water rights of riparian owners, valid under state law, constitute a substantial property right which may be enjoyed until taken away in the appropriate exercise of a paramount authority.[4]

So the question becomes whether Congress, by enacting the Federal Water Power Act of 1920, asserted its theretofore unexercised paramount power to declare all the waters of the Niagara essential for purposes of commerce, as the Act of 1909 did with respect to the St. Marys. If the mere passage of the Act amounted to a declaration by Congress that the entire flow of all navigable rivers is essential for use in commerce, then its passage extinguished all previously existing private water rights in all navigable streams, including of course the Niagara, and so destroyed the International Paper and

---

4. United States v. River Rouge Company, 1926, 269 U.S. 411, 420, 46 S.Ct. 144, 70 L.Ed. 339.

204

Pettebone-Cataract water rights. Conversely, however, if the Water Power statute did not declare the entire flow of all navigable streams to be necessary for navigation or other purposes of commerce, and consequently did not so declare with respect to the entire flow of the Niagara, the mere passage of the Act did not destroy the two water rights involved in this case. It is therefore necessary to construe the statute and to determine whether it purports to seize for legitimate national purposes all the flow of all navigable rivers, and so whether it had that effect with respect to the Niagara.

Before doing so, however, we think it well to have before us the provisions of a treaty between the United States and Great Britain, proclaimed May 13, 1910, which relates to diversions of water from the Niagara River for power purposes. The pertinent part of Article V of the Treaty is as follows:[5]

"The High Contracting Parties agree that it is expedient to limit the diversion of waters from the Niagara River so that the level of Lake Erie and the flow of the stream shall not be appreciably affected. It is the desire of both Parties to accomplish this object with the least possible injury to investments which have already been made in the construction of power plants on the United States side of the river under grants of authority from the State of New York, and on the Canadian side of the river under licenses authorized by the Dominion of Canada and the Province of Ontario.

"So long as this treaty shall remain in force, no diversion of the waters of the Niagara River above the Falls from the natural course and stream thereof shall be permitted except for the purposes and to the extent hereinafter provided.

"The United States may authorize and permit the diversion within the State of New York of the waters of said river above the Falls of Niagara, for power purposes, not exceeding in the aggregate a daily diversion at the rate of twenty thousand cubic feet of water per second.

"The United Kingdom, by the Dominion of Canada, or the Province of Ontario, may authorize and permit the diversion within the Province of Ontario of the waters of said river above the Falls of Niagara, for power purposes, not exceeding in the aggregate a daily diversion at the rate of thirty-six thousand cubic feet of water per second."

We observe that, in restricting the temporary withdrawal of waters from the Niagara, the only purpose of the High Contracting Parties was to prevent the level of Lake Erie and the flow of the river from being appreciably affected by diversion for power purposes. It was therefore not the intention of the two governments to take away the water rights then existent under state law and then being actually utilized, but simply to keep those rights within the prescribed maximum of 20,000 cfs. And in order to be sure that the Treaty should not be construed as having destroyed existing rights, the Parties wrote into it their desire.

"* * * to accomplish this object with the least possible injury to investments which have already been made in the construction of power plants on the United States side of the river under grants of authority from the State of New York * * *."

With the terms of the 1910 Treaty in mind, we turn to the Act of 1920 to see whether it purports to destroy the International Paper and Pettebone-Cataract water rights which the Treaty expressly protected. We find in it no declaration that the entire flow of the Niagara or any other navigable river is essential for navigation, and no pre-emption of it for that or any other use in commerce. In that respect the Act differs drastically from the statute of 1909, which was involved in the Chandler-Dunbar case. Quite to the contrary of the Congressional purpose declared in the 1909 Act to take the entire flow of the St. Marys,

5. 36 Stat. 2448, 2450.

the Water Power Act by its terms evinces a legislative intention to recognize private water rights held under state law so long as navigation does not require the entire flow. Section 3(11) defines the word "project" as a

"* * * complete unit of improvement or development, consisting of a powerhouse * * * and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands, the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit * * *."

Section 4(b) provides that

"To determine the actual legitimate original cost of and the net investment in a licensed project, and to aid the Commission in such determinations, each licensee shall, upon oath, * * * file with the Commission * * * a statement * * * showing the actual legitimate original cost of construction of such project, * * * and of the price paid for water rights, rights-of-way, lands, or interest in lands."

Section 9(b) requires each applicant for a license to submit to the Commission

"Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes * * *."

Section 14 provides that the United States may take over a project upon or after the expiration of the license, upon condition that it pay the net investment of the licensee in the project taken, not to exceed its fair value.

"* * * Such net investment shall not include or be affected by * * * the license or by good will, going value, or prospective revenues; nor shall the values allowed for water rights, rights-of-way, lands, or interest in lands be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee * * *."

These references to water rights in the Act seem to us to negative the notion that Congress intended by enacting it to destroy them. More important, however, because it has conclusive effect, is Sec. 27 of the Act which reads as follows:

"That nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."

We have shown that the International Paper and Pettebone-Cataract water rights are vested usufructuary rights acquired under New York law. Being such, they are protected by the terms of Sec. 27, just quoted. This was confirmed by First Iowa Co-op. v. Power Commission, 1946, 328 U.S. 152 at page 175, 66 S.Ct. 906, at page 917, 90 L.Ed. 1143, when the Supreme Court said:

"* * * Section 27 expressly 'saves' certain state laws relating to property rights as to the use of water, so that these are not superseded by the terms of the Federal Power Act."

Then, after quoting the text of Sec. 27, the Court went on to say, 328 U.S. pages 175–176, 66 S.Ct. at page 917:

"Section 27 thus evidences the recognition by Congress of the need for an express 'saving' clause in the Federal Power Act if the usual rules of supersedure are to be overcome. * * *

"The effect of § 27, in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses of the same nature. It therefore has primary, if not exclusive, reference to such proprietary rights. The phrase 'any vested right acquired therein' further emphasizes the application of the section to property rights. * * *"

The language of Sec. 27 is clear and unequivocal. Reinforced by the authoritative interpretation of the First Iowa case, it makes plain beyond peradventure that Congress did not intend the Water Power

Act to destroy vested property rights such as those here involved, but only to regulate their exercise.

Moreover, the legislative history of the Act shows that Congress was taking care not to impinge upon the rights of states nor upon their rules of property concerning diversions of water.[6] This Congressional concern was also expressed in the Act. For example, each applicant for a license thereunder is required by Sec. 9(b) to submit to the Commission

> "Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks *and to the appropriation, diversion, and use of water for power purposes* * * *." (Emphasis supplied.)

The respondent Commission relies upon Niagara Falls Power Company v. Federal Power Commission, 2 Cir., 1943, 137 F.2d 787, as support for its thesis that enactment of the Federal Water Power Act terminated the state-derived International Paper and Pettebone-Cataract rights, and that the federal license of 1921 has been and is the only source of the licensee's right to use Niagara waters. Its brief quotes the following from the opinion in that case:

> "When Congress set up the Commission with power to issue licenses for the 'utilization of power * * * from * * * any of the navigable waters of the United States' § 4(d) of the Act of June 10, 1920, 41 Stat. 1065, 16 U.S. C.A. § 797(e)[7] the Commission was vested with the distribution of this allotment [the Treaty allotment of 20,000 cfs to the United States], and any rights acquired from the State of New York necessarily yielded to what it might do (p. 790-1)."

The question before the Second Circuit in the cited case was whether the licensee's property should be carried on its books at original cost, or at fair value as of the date of its license under the Federal Power Act. A divided court held original cost should be used, with one judge dissenting from the "view that the words 'original cost' are to be limited to cost to the first investor in the power project."

The question before the Second Circuit was quite different from that before us. We are not concerned with the capitalization of assets, but with operating expense. Payments made by Niagara Mohawk for use of the Pettebone-Cataract and International Paper water rights are not elements which enter directly into determination of "net investment" under either the recapture or the ratemaking provisions of the Act, but are purely matters of operating expense. They enter into the amortization reserve only because they reduce net earnings and so reduce the "surplus earned," one-half of which must be passed to such reserve. That the items of expense which have been disallowed arose in good faith from arms-length negotiations is not denied; and that they have in fact been paid—in money or in furnishing electric energy—is not disputed. The payments should not have been disallowed unless the rights for which they were paid had been terminated by the Water Power Act so that the licensee derived such rights only from its federal license. We have already held the Water Power Act did not have that effect.

The language quoted above from the Second Circuit's opinion, which does not seem to have been necessary to decision, apparently assumes that the Treaty had the effect of destroying all diversionary rights under New York law and making the United States the fountainhead of any subsequent private right to use the allotted 20,000 cfs, with the result that the later established Commission could distribute the permitted quantity in disregard of established installations using water under New York authority but within the Treaty's limitation.

This is squarely contrary to the intention the two governments expressed in the Treaty. Congress had absolute power to stop Niagara Falls Power Company from

---

6. See remarks of Representative LaFollette, 56 Cong.Rec. 9810 (1917–1918).

7. Relettered 4(e) in the present Act.

taking any water whatever, as the Second Circuit said. But, as we have shown, it has never exercised that power, and the only term it has imposed is that a federal license be obtained. Such a license is a certificate that the exercise of the water rights therein described—rights which are valid under State law—does not interfere with navigation nor with any other use in commerce to which the flow of the stream might be put. In our view, rights acquired from the State of New York necessarily yielded to what the Commission may do only when the regulatory actions of the State and national governments conflict, as in the First Iowa case. For the reasons given we do not regard the cited case as persuasive here.

The licensing provisions of the Act also show, we think, that the measure was not an exercise of the undoubted right of Congress to destroy water rights valid under state law. By authorizing the Commission to issue licenses to use navigable water for power purposes, the statute negates the idea that it declares all such water necessary for use in commerce. Implicit, therefore, in the issuance of a license to Niagara Falls Power Company was a determination by the Federal Power Commission, pursuant to the policy of the Act, that the entire flow of the Niagara was not required for navigation or any other use in interstate commerce.

■ Much of the difficulty in this case has arisen from what we regard as a misconception of the Water Power Act and of the nature of licenses issued thereunder. The Act is purely a regulatory measure. A federal license is not an original grant of authority, but a permission to use a state's grant of authority. To be sure, a license is a pre-requisite in that water rights under state law in a navigable stream may not be exercised without one, as the Supreme Court held in the New River case.[8] And when state law or regulation conflicts with the Act, or with any lawful federal regulatory action, or with lawful terms of a federal license, state authority must yield to federal, as the Supreme Court held in the First Iowa case. But these considerations do not by any means require the conclusion that the Act and a license thereunder constitute the source from which all water rights flow. An applicant for a license must show the Commission he has under state law the right to divert the water for the use of which he desires a license. Unless he has that right, we think the Commission cannot lawfully issue a license to him.

The Power Commission says in the course of its argument, "Neither Buffalo Niagara nor its predecessors in interest, nor the International Paper Company own any lands riparian to the Niagara River to which the alleged water rights are claimed to be appurtenant." It also states that neither Buffalo Niagara nor International Paper has a license, with respect to the rights, from either the Federal Power Commission or the New York Water Power and Control Commission.

■ The statement that neither Buffalo Niagara nor its predecessors in interest own any riparian land to which the Pettebone-Cataract water rights are appurtenant is incorrect. The Niagara Falls Hydraulic Power and Manufacturing Company owned such riparian land and, by valid grant to the Pettebone-Cataract companies, severed from the land the right to take 262.6 cfs under a partial head, reserving the right to utilize that water under the remaining head. The Pettebone-Cataract rights passed to Niagara Lockport, which was succeeded by Buffalo Niagara. It is thus seen that Buffalo Niagara's predecessor in interest owned riparian land. The right to 262.6 cfs, though severed, continued to be in the nature of a riparian right. Such a corporeal hereditament is a property right which may be conveyed apart from the land to which it is incident.[9] The water rights of International Paper had a similar origin.

■ Nor is it necessary to the validity of the two sets of usufructuary property rights that Buffalo Niagara and Interna-

8. United States v. Appalachian Electric Power Company, 1940, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243.

9. United Paper Board Co. v. Iroquois Pulp & Paper Co., 1919, 226 N.Y. 38, 46, 123 N.E. 200, 203.

tional Paper have either state or federal licenses. Such authority must be held by him who exercises the rights. Niagara Mohawk, which is the user, holds a federal license therefor and, as we have shown, is not required to have a State license because it pays rent to the State of New York for the water utilized.

 We hold that the Pettebone-Cataract and International Paper water rights are valid usufructuary property rights under the law of New York; that the Treaty of 1910 did not destroy them but preserved their integrity; that the Water Power Act of 1920 did not extinguish the rights but simply forbade their use without a federal license; that such a license is not the source of water rights but a permission to exercise usufructuary rights acquired pursuant to State law; that the payments made by the petitioner under its contractual obligations as lessee of the water rights are proper operating expenses.

It follows that Federal Power Commission erred in disallowing the payments in question and in increasing on that account the petitioner's amortization reserve liability. The case will be remanded to the Commission with instructions to modify its order of September 27, 1950, in accordance with the views herein expressed.

Remanded for modification of order.

BAZELON, Circuit Judge (dissenting).

Petitioner is required by § 10(d) of the Federal Power Act[1] to maintain a surplus amortization reserve account, a percentage of which is applied to reduce the amount of its net investment. Such net investment provides the basis for the Government's liability in the event it exercises its option to take over petitioner's licensed project under the recapture provisions of § 14.[2] In computing this reserve account, petitioner, in effect, diminished it by the amount of certain charges made by others for use of their state created private water rights. Because the Commission viewed such charges as unallowable in computing the Government's liability, it ordered petitioner to increase the required reserves by the amount of such charges. It is that order we review.

All private riparian rights acquired under state law to the use of water in a navigable stream are subject to the preemptive rights of the State and of the United States.[3] And whenever the United States asserts its paramount preemptive right in the exercise of its power to regulate commerce, "[i]t is liable to no one for its use or nonuse,"[4] except to the extent and in the manner Congress "expressly" saves private rights.[5] I dissent here because in my view the Federal Power Act does assert the preemptive right of the United States in the exercise of

1. 41 Stat. 1069 (1920), as amended, 49 Stat. 843 (1935), 16 U.S.C.A. § 803(d): "That after the first twenty years of operation, out of surplus earned thereafter, if any, accumulated in excess of a specified reasonable rate· of return upon the net investment of a licensee in any project or projects under license, the licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until the termination of the license or be applied from time to time in reduction of the net investment. Such specified rate of return and the proportion of such surplus earnings to be paid into and held in such reserves shall be set forth in the license."

2. Section 14 provides in pertinent part: "Such net investment shall not include or be affected by the value of any lands, rights-of-way, or other property of the United States licensed by the Commis-

sion under this Act, by the license or by good will, going value, or prospective revenues; nor shall the values allowed for water rights, rights-of-way, lands, or interest in lands be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee." 41 Stat. 1071 (1920), as amended, 49 Stat. 844–845 (1935), 16 U.S.C.A. § 807 (emphasis supplied).

3. United States v. Chandler-Dunbar Co., 1913, 229 U.S. 53, 62–65, 69, 33 S.Ct. 667, 57 L.Ed. 1063; Long Sault Development Co. v. Kennedy, 1914, 212 N.Y. 1, 105 N.E. 849, 852, writ dismissed, 1916, 242 U.S. 272, 280, 37 S.Ct. 79, 61 L.Ed. 294.

4. United States v. Appalachian Power Co., 1940, 311 U.S. 377, 424, 61 S.Ct. 291, 307, 85 L.Ed. 243.

5. First Iowa Co-op. v. Federal Power Comm., 1946, 328 U.S. 152, 175, 66 S. Ct. 906, 90 L.Ed. 1143.

its power to regulate commerce and does not save the private rights in question.

In United States v. Appalachian Power Co., the Supreme Court held that the Federal Power Act was an assertion of United States rights under the commerce power.[6] The impact of this view upon the relationship between state and federal law was amplified in First Iowa Co-op v. Federal Power Comm.[7] The Court there pointed out that "in those fields where rights are not * * * 'saved' to the states, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course."[8] In a later case, Grand River Dam Authority v. Grand Hydro, the Court refused to apply the principle of supersedure because "the United States, or its licensee as such," was not a party.[9] I read these cases as formulating this rule: At least as applied to the United States or

its licensee as such, the Federal Power Act is an assertion of the commerce power which constitutes a taking by the United States without compensation of all water rights affecting navigable streams except to the extent and in the manner that the Act expressly saves certain rights created under state law.

Applying this rule to the present case, no charge for state created water rights would be allowed against the United States unless the Act expressly saves these rights. It is said that such rights are saved by § 14 because it provides that "the values allowed for water rights" in determining the licensee's net investment for purposes of recapture by the United States shall not "be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee."[10] But this section does not save

6. 311 U.S. 377, 424, 61 S.Ct. 291, 85 L.Ed. 243. The Supreme Court specifically found that §§ 10(d) and 14 of the Act, *inter alia*, "have an obvious relationship to the exercise of the commerce power." Id., 311 U.S. at pages 420, 427, 61 S.Ct. at page 308. And it expunged the argument that the touchstone of commerce control lies in as restricted a concept of navigation as "no more than operation of boats and improvement of the waterway itself." Id. 311 U.S. at page 426, 61 S.Ct. at page 308. It plainly enunciated a broader concept: "Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control." Ibid. Thus, the Court concluded that because "the Commission is willing to give a license for a power dam only is of no significance in appraising the type of conditions allowable." Ibid.

For present purposes we need not ponder whether United States rights under the commerce power were first asserted by the enactment of the Rivers and Harbors Act of 1899, 30 Stat. 1151; or the Burton Act of 1906, 34 Stat. 626; or the series of enactments which preceded the Federal Power Act.

7. 1946, 328 U.S. 152, 66 S.Ct. 906, 90 L. Ed. 1143.

8. Id. 328 U.S. at page 176, 66 S.Ct. at page 917; and see Niagara Falls Power Co. v. Federal Power Comm., 2 Cir., 1943, 137 F.2d 787, 790. But cf. Schwartz v.

State of Texas, 1952, 73 S.Ct. 232, and cases cited therein.

9. 1948, 335 U.S. 359, 373, 69 S.Ct. 114, 121, 93 L.Ed. 64.

10. See note 2, supra. Other sections of the Act are said to indicate an intention to save the water rights involved here. But none are saving clauses:

Section 3 defines the meaning to be given certain words for purposes of the Act. Subsection (11) merely defines "project" to include water rights.

Section 4(b) only authorizes the Commission to obtain certain information, including "the price paid for water rights," to aid in determining "the actual legitimate original cost of and the net investment in a licensed project." It does not purport to fix either the method or items for such a determination. The purely information-gathering character of this provision is strikingly similar to that of § 9(b) and is in no sense a recognition of any rights.

Section 9(b), as construed by the Supreme Court in First Iowa Co-op. v. Federal Power Comm., 1946, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143, is not a saving clause:

"Section 9(b) does not resemble § 27. It must be read with § 9(a) and (c). The entire section is devoted to securing adequate information for the Commission as to pending applications for licenses. * * * § 9(b) calls for legal information. This makes § 9(b) a natural place in which to describe the evidence which

any water rights from supersedure. It merely provides a standard of compensation for rights saved. It is only § 27 which "expressly 'saves' certain state laws relating to property rights as to the use of water, *so that these are not superseded by the terms of the Federal Power Act.*"[11] That section provides in pertinent part:

"That nothing herein * * * shall be construed as affecting * * * the laws of the respective States relating to the control, appropriation, use, or distribution of water *used in irrigation* or *for municipal or other uses,* or any vested right acquired therein."[12]

"The effect of § 27, in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal *or other uses of the same nature.*"[13] The words " 'other uses' * * * are confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes."[14] And the phrase "any vested right acquired *therein*" limits the "property rights" saved to those related to such purposes.[15]

Since no claim is made that the proprietary water rights here are related to such purposes, I conclude that they have not been saved from supersedure by the Act.[16]

the Commission shall require in order to pass upon applications for federal licenses. This makes it a correspondingly unnatural place to establish by implication such a substantive policy as that contained in § 27 * * *." Id., 328 U.S. at page 177, 66 S.Ct. at page 918, 90 L. Ed. 1143.

" * * * The directness and clarity of § 27 as a 'saving' clause and its location near the end of the Act emphasizes the distinction between its purpose and that of § 9(b) * * *. In view of the use by Congress of such an adequate 'saving' clause in § 27, its failure to use similar language in § 9(b), is persuasive that § 9(b) should not be given the same effect as is given to § 27." Id., 328 U.S. at page 175, 66 S.Ct. at page 917.

Section 10(c), making a licensee "liable for all damages occasioned to the property of others" resulting from the construction or operation of the project, significantly provides that "in no event shall the United States be liable therefor." Cf. Ford & Son v. Little Falls Co., 1930, 280 U.S. 369, 50 S.Ct. 140, 74 L. Ed. 483.

Section 20 deals with project valuation for rate making purposes and provides, *inter alia*, that "no value shall be claimed or allowed for the rights granted by the commission or by this Act." Since petitioner's right to the water power in question here is derived from a license issued under the Act, this provision is consistent with rather than contrary to my view.

Section 21 confers the power of condemnation upon a licensee to acquire "an unimproved dam site or the right to use or damage the lands *or property* of others." The absence of any reference to water rights, despite the obvious care for mentioning them throughout the Act, discounts the notion that water rights were intended to be embraced by the words "or property." Instead it suggests congressional awareness that rights in "waterways for the use * * * of interstate or foreign commerce" depend not upon condemnation of private rights by a licensee but only upon a grant by way of license under the Act. And even if water rights were meant to be included, there is nothing to indicate that they are saved for purposes of compensation.

Section 23 provides in effect that net investment shall be allowed at fair value, rather than actual reasonable cost, for projects constructed prior to the Act under permits "heretofore granted." In Niagara Falls Power Co. v. Federal Power Comm., 2 Cir., 1943, 137 F.2d 787, 790, the court held (1) that the permits referred to in this section were indefeasible grants issued by federal authorities and (2) that petitioner did not have such a permit.

11. 1946, 328 U.S. 152, 175, 66 S.Ct. 906, 917, 90 L.Ed. 1143 (emphasis supplied).

12. 41 Stat. 1077, 16 U.S.C.A. § 821 (emphasis supplied).

13. 1946, 328 U.S. 152, 175–176, 66 S.Ct. 906, 917, 90 L.Ed. 1143 (emphasis supplied).

14. Id., 328 U.S. at page 176, 66 S.Ct. at page 917.

15. Ibid. (emphasis supplied). To the extent that this court's decision in Alabama Power Co. v. McNinch, 1937, 68 App.D.C. 132, 147, 94 F.2d 601, 616, is in conflict with this more recent ruling of the Supreme Court, it cannot be followed here.

16. If the alleged private water rights are ultimately held to be valid as between

Hence they are not compensable under § 14, and any charges for their use are not deductible in computing the reserves required by § 10(d). I would, therefore, affirm the Commission's order.

the private parties, it "is the price which [petitioner] must pay to secure the right to maintain [its project]." Fox River Co. v. Railroad Commission, 1927, 274 U. S. 651, 657, 47 S.Ct. 669, 71 L.Ed. 1279, quoted with approval in United States v.

Appalachian Power Co., 1940, 311 U.S. 377, 427–428, 61 S.Ct. 291, 85 L.Ed. 243. And see Grand River Dam Authority v. Grand Hydro, 1948, 335 U.S. 359, 374, 69 S.Ct. 114, 93 L.Ed. 64.